CONTINENTAL INSURANCE COMPANY ET AL. *v.* UNITED STATES, READING COMPANY, ET AL.

PROSSER ET AL., AS A COMMITTEE REPRESENTING HOLDERS OF COMMON STOCK OF THE READING COMPANY, *v.* UNITED STATES, READING COMPANY, ET AL.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 609, 610.   Argued January 18, 19, 1922; restored to docket for reargument February 27, 1922; reargued April 10, 11, 1922.— Decided May 29, 1922.

1. Upon an appeal under the Expedition Act of February 11, 1903, as modified by Jud. Code, § 291, from a decree entered under a mandate of this court directing the dissolution of a combination in restraint of interstate trade, this court has jurisdiction, of its own motion and independently of the assignments of error, to determine whether the mandate has been properly complied with and to require such compliance.   P. 165.

2. A plan decreed by the District Court (summarized in the opinion, *post,* 166,) for dissolving the combination adjudged unlawful in *United States* v. *Reading Co.,* 253 U. S. 26, *approved,* in so far as it provides: for merging the Philadelphia & Reading Railway Company in the Reading Company, shorn of corporate capacity to do other than a railroad business; for separating the Central Railroad Company of New Jersey from the Reading Company by sale or disposition of the shares of the former held by the latter (p. 175); for separating the Lehigh & Wilkes-Barre Coal Company by sale of its stock held by the Central Railroad Company of New Jersey (p. 175); and for separating the Reading Company from the Philadelphia & Reading Coal & Iron Company by transfer of all the stock of the latter (held by the former) to a new coal company, to be organized by trustees of the court, the stock of which shall be issued under conditions assuring that those who acquire it shall not be interested in the Reading Company;—but *disapproved,* in so far as it leaves the capital stock and properties of the Philadelphia & Reading Coal & Iron Company subject to the lien of an out-

standing general mortgage covering also much of the property of the Reading Railway Company, payment of which, as between these two, is assumed by the Reading Company, and in so far as it provides that the Philadelphia & Reading Coal & Iron Company shall give a new mortgage of all its property to secure bonds to be delivered by it to the Reading Company in the adjustment of their financial relations.  P. 167.

3. The court has power under the Sherman Anti-Trust Act, in dissolving a combination of two corporations, to disregard the letter and legal effect of a general mortgage of their properties and of the bonds secured thereby, in order to achieve the purpose of the act. P. 171.  *United States* v. *Southern Pacific Co., post*, 214.

4. In this case, the general mortgage of the Reading Company and the Philadelphia & Reading Coal & Iron Company gave notice on its face of the unlawful union and purpose of which it was the necessary instrument, and those who took the bonds thus secured, although they may have done so innocently, relying on legal advice and surrendering valid underlying liens created before the Sherman Act, hold them subject to the judicial power to free the two properties from the consolidating tendency of the mortgage by relieving one of them from the lien and substituting a judicial equivalent in protection of the bondholders.  P. 171.

5. The decree in this case should modify the liability under the general mortgage and bonds so that the obligation of each mortgagor company upon the bonds, and the lien upon its property, shall be reduced to an amount proportionate to the ratio of the value of its property subject to the mortgage to the value of all the property so mortgaged, and should make specific provisions for foreclosure of the resulting separate liens in case of default.  P. 173.

6. Any injury to the security caused by this modification of the terms of the debt and mortgage may be compensated by such payment to the bondholders, by either or both mortgagor companies, as may seem equitable and convenient.  P. 174.

7. Authority is given the District Court to amend the plan of dissolution for the purpose of leaving the Reading Company properly financed, and to make such detailed changes as, after full hearing of all the parties, it may find practically necessary in following the general outlines of the modifications here made.  P. 174.

8. The decree should provide not only that all stockholders of the new coal company, upon receiving and registering their stock, shall make affidavits that they are not owners or the agents or representatives of owners of stock in the Reading Company, but also

should require the merged Reading Company to adopt a by-law, effective until the further order of the court, permitting registration of transfers of its stock only in the names of persons who make affidavit that they are not stockholders of the new or old coal companies and have not been and are not holders of proxies to vote shares therein. P. 175.

9. The plan of dissolution provides that the stock of the new coal company shall be disposed of primarily by sale to the preferred and common stockholders of the Reading Company, share and share alike, of assignable certificates exchangeable for the new coal company's shares by holders who prove at the time that they are not stockholders or representing stockholders of the Reading Company or in any agreement in its interest for the control of the coal company. *Held:*

(*a*) That the so-called sale is in effect a distribution of forbidden surplus assets of the Reading Company to its stockholders, small payments being required for the purpose of providing the company with additional capital for the operation of its railway system. P. 176.

(*b*) That the distribution as between the preferred and common stockholders must be determined by the organization agreement of the Reading Company defining their rights and must be *pro rata,* whether under that agreement the net profits of any past year, after paying preferred shareholders their full percentage, may be divided among the common stockholders or not, since the declaring of any dividend is left to the honest discretion of the board of directors, and undivided profits are to be regarded as capital assets and distributed on liquidation, the board not having applied them as dividends. P. 177.

10. It is a general rule that stockholders, common and preferred, share alike in the assets of a liquidating corporation, if the preference be only as to dividends. P. 181.

11. Whether, under the federal Commodities Clause and the Constitution of Pennsylvania, it will be proper and lawful that the Reading Company, becoming reorganized as a railroad corporation, continue to own stock of the Reading Iron Company, an iron manufacturing concern, will be determined, and the plan of dissolution modified accordingly, by the District Court. P. 181.

273 Fed. 848, affirmed with modifications.

This case presents the questions, first whether a decree of the District Court entered under a mandate from this

court in *United States* v. *Reading Co.*, 253 U. S. 26, is in accordance therewith, and second, whether it does equity to the appellants.

The original suit was instituted by the United States to dissolve the relation existing between the Reading Company, the Philadelphia & Reading Railway Company, the Philadelphia & Reading Coal & Iron Company, all corporations of Pennsylvania, the Central Railroad Company of New Jersey, a corporation of New Jersey, and the Lehigh & Wilkes-Barre Coal Company, a corporation of Pennsylvania, as a combination to restrain and monopolize interstate commerce in anthracite coal, and to violate the Commodities Clause of the Act of June 29, 1906, c. 3591, 34 Stat. 585.

This court found that by a scheme of reorganization, adopted in December, 1895, the Philadelphia & Reading Railway Company and the Philadelphia & Reading Coal & Iron Company combined to deliver into the complete control of the board of directors of a holding company, the Reading Company, all of the property of much the largest single coal company operating in the Schuylkill field, and almost one thousand miles of railway over which its coal must find its access to interstate markets, and that this constituted a combination unduly to restrain and monopolize interstate commerce in anthracite coal; that the Philadelphia & Reading Railway Company and the Philadelphia & Reading Coal & Iron Company had thereafter but one stockholder, the Reading Company, and that thus the Reading Company served to pool the property, the activities and the profits of the three companies. The court further found that through the acquisition by the Reading Company of a majority of the stock of the Central Railroad Company of New Jersey which itself owned 90 per cent. of the stock in the Lehigh & Wilkes-Barre Coal Company, the illegal power of the combination was greatly increased, and that the relation of common control through

stock ownership of the Philadelphia & Reading Railway
Company and the Philadelphia & Reading Coal & Iron
Company, and that of the Central Railroad Company of
New Jersey and the Lehigh Valley & Wilkes-Barre Coal
Company were violations of the commodities clause, re-
quiring dissolution.   The court, therefore, remanded the
case to the District Court directing a decree in conformity
to the opinion dissolving the whole combination of the
four companies with the Reading Company and such dis-
position of the shares of stocks and bonds and other prop-
erty of the Reading Company as might be necessary to es-
tablish the entire independence of each company from the
others, to the end that the affairs of all of them might be
conducted in harmony with law.

For convenience the Philadelphia & Reading Railway
Company will be called the Reading Railway Company,
the Philadelphia & Reading Coal & Iron Company the
Reading Coal Company, the Central Railroad Company
of New Jersey the New Jersey Railroad Company, and the
Lehigh & Wilkes-Barre Coal Company the Wilkes-Barre
Coal Company.

The situation at the time the District Court was di-
rected to enter its decree was as follows: The Reading
Company, the holding company, had a special charter un-
der the laws of Pennsylvania granted prior to the adoption
of the constitution of that State of 1874, with unusually
broad powers.   It was not engaged directly in operating
a railroad and was not subject to regulation by federal or
state authorities having jurisdiction over common carriers.
It owned the entire capital stock of the Reading Railway
Company, being $42,481,700 par value, and $20,000,000
of its bonds; $8,000,000, par value, being the entire capital
stock of the Reading Coal Company; the real estate, roll-
ing stock and floating equipment used upon or in connec-
tion with the Reading Railway System; shares of stock
and bonds of other railroads and terminal companies, con-

stituting a part of the Reading Railway System; $14,504,-
000, par value, being more than a majority, of the stock
of the New Jersey Railroad Company, all of which was
pledged except forty shares under a collateral trust mort-
gage to secure $23,000,000 worth of bonds.  These were
not all its holdings, but they are all that are important
here.

On January 5, 1897, the Reading Company and the
Reading Coal Company jointly gave a mortgage to the
Central, now the Central Union Trust Company of New
York, trustee, hereafter to be referred to as the general
mortgage.  The security under this mortgage was all the
property of the Reading Coal Company and all of its
capital stock, together with all of the capital stock of the
Reading Railway Company and all the railroad equipment
and certain real estate essential to the operation of the
Reading Railway Company, which was held by the Read-
ing Company, together with certain bonds of the Railway
Company.  The bonds now outstanding under this mort-
gage amount in round figures to $93,000,000.

A combination of the Reading Railway Company and
the Reading Coal Company had been maintained for
years and the property of the Reading Coal Company had
been greatly enlarged by purchases and improvements
through money advanced by the Reading Railway Com-
pany, resulting in an indebtedness of the Reading Coal
Company to the Reading Railway Company which ulti-
mately amounted to about $70,000,000.  In 1896, when
the Reading Company became the holding company
under the then formed combination, this indebtedness of
the Coal Company to the Railway Company appeared as
a credit on the books of the Reading Company, and a
debit on the books of the Coal Company, but it is quite
clear that they were mere bookkeeping entries and that
it had been agreed that they should be canceled.  They
are canceled in the proposed plan.

9545°—23——11

Under the plan embodied in the decree of the District Court, the Reading Company is as between it and the Reading Coal Company to assume the whole liability under the general mortgage, and agrees to save the Coal Company and its property harmless therefrom. The Reading Company is to receive from the Reading Coal Company $10,000,000 in cash or current assets, and $25,-000,000 in 4 per cent. bonds of the Reading Coal Company, secured by mortgage on its properties. The Reading Company is to transfer its interest, subject to the lien of the general mortgage, in all the stock of the present Reading Coal Company, amounting to eight million dollars in par value but actually worth many times that amount, including the right to vote and receive dividends thereon, to a new Reading Coal Company, a corporation to be created under the supervision of the District Court, and over which that court is to retain control so as to prevent its being used to thwart the decree.

The new Coal Company agrees to issue as its total capital stock 1,400,000 shares without par value, to a trustee or trustees appointed by the District Court, who are to transfer to the Reading Company assignable certificates of interest in the stock of the new Coal Company, for distribution to its stockholders. The certificates are to be exchangeable for such stock only when accompanied by an affidavit, stating among other things that the holder is not an owner of any stock of the Reading Company and is not acting for or on behalf of any stockholder of the Reading Company, or in concert, agreement or understanding with any other person, firm or corporation for the control of the Coal Company in the interest of the Reading Company, but in his own behalf in good faith.

The certificates of interest are to be offered for so-called sale by the Reading Company to its stockholders, preferred and common, share and share alike, for $2.00 for each share of the Reading Company. Such stockholders

can not, however, continue as stockholders of the Reading Company and become stockholders of the new Coal Company during the conversion period, but each must dispose of his certificates of interest in the new Coal Company or of his stock in the Reading Company. If, after July 1, 1924, any of the certificates shall remain outstanding, the court in its discretion and after a hearing may order the shares covered by such certificates to be sold and the proceeds distributed to the owners of such certificates. The Attorney General is given access to the transfer books of both companies to enforce compliance with the order. This secures to the Reading Company in cash $5,600,000.

Second: The Reading Company will merge into itself the Reading Railway Company and all the railway property of the Reading Railway Company is to be made subject to the direct lien of the general mortgage. The existing charter of the Reading Company authorizes such a merger. The Reading Company is to accept the Pennsylvania constitution of 1874, and to proceed under the Pennsylvania Act of 1856 to surrender those of its franchises which are inappropriate for a railroad corporation of Pennsylvania. It will thus become a railway company subject in all respects to the regulation of the state and federal authorities as a common carrier.

Third: The Reading Company is to transfer to trustees appointed by the District Court, subject to the lien of the collateral trust mortgage already mentioned, all of its interest in the stock of the New Jersey Railroad Company. The final disposition of this stock is to be deferred in view of the possible groupings of railroads by the Interstate Commerce Commission under the Transportation Act of 1920, but is to be subject to an order of sale by the court in its discretion before that time. The trustees are directed to select directors and secure a management of the New Jersey Railroad Company entirely independent of

the Reading Company, which shall discharge its duties under the supervision of the court.

Fourth: The stock of the Wilkes-Barre Coal Company, held by the New Jersey Railroad Company is by the decree to be sold to persons not stockholders of the New Jersey Railroad Company, the Reading Company, the Reading Railway Company, or the new Reading Coal Company, and who shall qualify as purchasers of the same by an affidavit like the one already mentioned. It appears that this provision of the decree has already been carried out because not appealed from, and that the stock of the Wilkes-Barre Coal Company has been sold, though there is pending an application to set the sale aside.

The appeals in this case were taken by the Insurance Companies, who own 8,400 shares of the common stock of the Reading Company, less than one per cent. of the entire common stock, and by the so-called Prosser Committee, also interveners, who represent 407,728 shares of the common stock, which is somewhat less than 30 per cent. of the total common stock, and less than 15 per cent. of the entire capital stock of the Company. Their appeals are based on the claim that the right to subscribe for the certificates of interest in the stock of the new Coal Company belong to the common stockholders of the Reading Company and to them alone, to the exclusion of the preferred stockholders.

After the first argument of these appeals, the court directed a second argument upon the questions (1) whether the plan adopted by the District Court was in conformity with this court's mandate, in establishing the entire independence of the companies found in unlawful combination from each other, (2) whether there was any legal or practical difficulty in selling the Reading Coal Company's stock free from the lien of the general mortgage, and (3) what was the basis of the adjustment of the indebtedness between the Reading Company and the new and old Reading Coal Companies. [257 U. S. 622.]

*Mr. R. C. Leffingwell,* with whom *Mr. Charles Heebner, Mr. Wm. Clarke Mason, Mr. L. D. Adkins* and *Mr. A. I. Henderson* were on the brief, for the Reading Company.[1]

*Mr. John M. Perry,* with whom *Mr. Arthur H. Van Brunt* was on the brief, for Central Union Trust Company of New York.

*Mr. Alfred A. Cook,* with whom *Mr. Frederick F. Greenman* and *Mr. Robert Szold* were on the brief, for appellants in No. 609.

*Mr. George W. Wickersham,* with whom *Mr. Edwin P. Grosvenor* was on the brief, for Iselin et al., a committee representing preferred stockholders.

*Mr. Joseph M. Hartfield,* with whom *Mr. Roberts Walker, Mr. J. DuPratt White* and *Mr. Allen McCarty* were on the briefs, for appellants in No. 610.

*Mr. Solicitor General Beck,* with whom *Mr. Attorney General Daugherty, Mr. Assistant to the Attorney General Goff* and *Mr. Abram F. Myers,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the court.

The appeals which brought this case here were taken under the Act of Congress approved February 11, 1903, c. 544, 32 Stat. 823, as modified by § 291 of the Judicial Code. Ordinarily the scope of our review of the decree of

---

[1] At the former hearing, arguments were made, on behalf of Joseph E. Widener, appellee, and on behalf of William B. Kurtz et al., appellees, by *Messrs. Ellis Ames Ballard* and *Thomas Raeburn White,* respectively. No argument was made by the *Solicitor General* or on behalf of the Central Union Trust Company. For the order restoring the case for reargument, see 257 U. S. 622.

the District Court would be limited to the assignments of error of the appellants, but in this case, as the decree which is before us was entered under a mandate of this court, we have jurisdiction to consider on our own motion whether our mandate has been complied with. We delegated to the District Court the duty of formulating a decree in compliance with the principles announced in our judgment of reversal, and that gives us plenary power where the compliance has been attempted and the decree in any proper way is brought to our attention to see that it follows our opinion.

The plan of dissolution of the bond between the four companies under the control of the holding company is, shortly, as follows:

1. It merges the Reading Railway Company in the Reading Company and shears the latter of corporate capacity to do other than a railroad business.

2. It turns over to trustees of the court for sale or disposition in accord with the plan of groupings by the Interstate Commerce Commission to be adopted under the Transportation Act the majority stock of the New Jersey Railroad Company.

3. It separates the Wilkes-Barre Coal Company from the New Jersey Railroad Company by directing the sale of that stock to persons who do not own stock in any of the other companies.

4. It separates the Reading Company from the Reading Coal Company by a transfer of all the stock in the latter company to a new coal company to be organized by trustees of the court, and directs a distribution to the stockholders of the Reading Company, in proportion to their respective holdings of stock in the latter company, of valuable rights, evidenced by so-called certificates of interest, to dispose of the stock in the new Coal Company. The effect of the decree is to require them either to sell these certificates to others not stockholders in the Read-

ing Company, or to sell their stock in the Reading Company before themselves becoming stockholders in the new Coal Company, or doing neither, and receiving no interest in the interval, to let the court sell the new stock after July 1, 1924, for their account.

The difficulty in the separation of the interests of the Reading Company and the Reading Coal Company is that the lien of the general mortgage covers much of the property of the Reading Company and all of the stock and property of the Coal Company and is not redeemable until 1997. The plan requires the Reading Company to assume the whole liability of the general mortgage and to save the old and new Coal Companies harmless therefrom in consideration of $10,000,000 cash or current assets and $25,000,000 in bonds secured by mortgage on all its property by the Reading Coal Company, redeemable at the same time as the general mortgage. This is on the assumption in which all agree that the respective liabilities of the Reading Company and the Coal Company under the lien of the mortgage as between themselves should be regarded as something less than three to one.

The doubt whether the plan is adequate to secure the object of this court has been prompted by the failure to take out from under the lien of the general mortgage the capital stock and the properties of the Reading Coal Company and the giving of a new mortgage by the Reading Coal Company on all its property to secure bonds to be delivered by it to the Reading Company. The query is whether this would not leave in the Reading Company some possible measure of future control over the Coal Company and enable the Reading Company later on to reestablish in effect the combination which, this court decided, must be ended.

It is further questioned whether the interest which the new Coal Company, with its properties still subject to the lien of the general mortgage, will have in preserving the

solvency of the Reading Company, would not create a constant motive on its part to favor the Reading Company with its tonnage and discriminate against other carriers reaching its mines. It is pointed out, too, that the interest of the Reading Company in the continuing ability of the Coal Company to avoid default on its proposed mortgage for $25,000,000 to secure bonds to be given to the Reading Company, would prompt a community of operation between the two companies which it was the object of this court to end.

All these difficulties, it is said, could be removed if all of the properties and stock of the Coal Company were sold outright and the purchase money applied to the satisfaction *pro tanto* of the general mortgage by depositing with the trustee cash or current securities equal to one-third of the amount of the general mortgage debt, as the fair ratio of the Coal Company's contribution to the security of that company, the remainder of the proceeds of sale to go to the Reading Company for its proper disposition as assets of its own.

When the mandate went down, the District Court invited the Reading Company to propose a plan for the dissolution of the illegal combination for submission to all the parties in interest, including, of course, the Government. The first form of plan contemplated that the release of the stock and properties of the Reading Coal Company from the lien of the general mortgage should be secured by the Reading Company's paying to each bondholder, in consideration of his release, a cash premium of ten per cent. of the par value of the bonds he held. This did not meet with the favor of the bondholders or of their trustee. The common stockholders of the Reading Company also objected. The Solicitor General in his discussion of the plan put the case thus:

"The Attorney General, therefore, was confronted with these alternatives: (1) To insist upon the court ordering

the release of the stock and properties of the Reading Coal Company from the lien of the general mortgage without the consent and over the protest of the trustee and the bondholders; or (2) To assent to a modification of the plan which, while placing in different hands the stock control of the Reading Company and the Reading Coal Company and providing effective safeguards against future inter-corporate relations, would leave the stock and properties of the latter pledged under the general mortgage.

" The following considerations appeared to make the latter course the wiser as well as the more expedient:

"(1) The attitude of the trustee and bondholders made it clear that the former course would meet with an opposition which certainly would have resulted in another appeal to this court with consequent delay in effecting a dissolution."

The fourth reason was stated as follows:

"(4) Finally, and most important, the country at that time was in the midst of a serious financial and industrial depression accompanying the transition from the artificial stimulations of war to normal conditions of peace. The condition was regarded as critical. Grave apprehension was felt that if the Government should insist upon the disruption of the general mortgage public confidence in the restoration of prosperity might be adversely affected. It seemed the course of wisdom, therefore, to avoid the possibility of contributing further to an already threatening situation if it could be done without sacrifice to the effectiveness of the dissolution. The Government was not averse to any necessary surgery, but it seemed wise not to amputate any more than was necessary to secure the great policy of the Sherman law. In this it followed the admonition of this court in the *Standard Oil* and *Tobacco Cases* that innocent interests, as the present holders of the bonds in question were, should be spared unnecessary injury."

It is asserted further by the Reading Company, and not denied, that, when this decree was entered by the District Court, the monetary situation was such that it would have been impossible to secure a purchaser of the Reading 'Coal Company properties at any fair price, that indeed the transaction could not have been financed at all.

The considerations influencing the District Court and the Government against a drastic readjustment of the interests of the bondholders under the general mortgage and the holdings of the two offending companies were of manifest weight in the then business and monetary situation. Even now this court would hesitate to order a sale of this kind of property worth probably one hundred million dollars with confident hope of realizing an adequate amount with the necessary restrictions as to the purchaser. We agree with the Attorney General in his disinclination to insist upon such a sale under the circumstances. Since the time of settling the decree, however, a change for the better has come in the financial situation. We think that this justifies us now in making some modifications in the plan which were not presented to the parties or considered by the court, possibly because they might have been unwise in the critical conditions then existing. They involve a departure from the contract provisions of the general mortgage and the bonds it secures.

The petition of the trustee under the general mortgage urges that a court of equity ought not by its decree, summarily to wrench the Coal Company's property from under the pledge of the mortgage, or to vary its terms in view of the circumstances. It points out that neither the trustee nor the bondholders were made parties to the original bill to set aside the combination and monopoly, and that the trustee was made a party to the proceeding only after the mandate of this court went down. The petition avers the innocence of any wrongdoing on the part of the bondholders, and alleges that, of the $106,-

000,000 of bonds issued, $50,000,000 were issued at or about the date of the mortgage in 1896, $36,000,000 were issued between 1897 and 1920 to take up and in exchange for underlying bonds that were liens prior to reorganization and for the most part prior to the passage of the Sherman Act, and $20,000,000 were issued between 1898 and 1911 for betterments. It further alleges that for twenty years after this mortgage was executed, its validity, as far as the bondholders are concerned, has not been questioned by the Government and these bonds have passed into the hands of numerous and widely scattered holders, that few of them, if any, are or were identified at all with the management of the Reading Company or Coal Company, and many of the bonds are held by fiduciaries.

The power of the court under the Sherman Anti-Trust Law to disregard the letter and legal effect of the bonds and general mortgage under the circumstances of this case, in order to achieve the purpose of the law, we can not question. The principles laid down and followed in the case of *United States* v. *Southern Pacific Co.*, decided today, *post,* 214, leave no doubt upon this point. Indeed, the case which we there cite, *Philadelphia, Baltimore & Washington R. R. Co.* v. *Schubert,* 224 U. S. 603, 613, 614, is a stronger instance of the power of Congress in regulating interstate commerce to disregard contracts than is needed in this case, because there it was enforced as to a contract made before the regulation. It may be conceded, as averred, that the bondholders in this case were innocent of any actual sense of wrongdoing, that they relied on the advice of eminent counsel in assuming that the union of the Railroad and the Coal Companies under the control of the holding company was not a violation of the Sherman Law, and that some of them surrendered bonds secured by underlying liens of unquestioned valid-

ity created before the enactment of the Sherman Law. Nevertheless, spread all over the face of the general mortgage, was the information and notice of the union of the railway and coal properties for the very purpose which is the head and front of the offending under the Anti-Trust Law and which requires this court to dissolve the illegal combination. The general mortgage was the indispensable instrument of the unlawful conspiracy to restrain interstate commerce. It was the advantage of the legally improper relation between the railway and coal interests which made the security so attractive. In one of the phases of a case, reported as *United States* v. *Lake Shore & M. S. Ry. Co.*, 203 Fed. 295, the Court of Appeals of the Sixth Circuit was obliged to consider on an intervening petition, the question of the power of the court under the Sherman Act to deal with a mortgage whose lien if held to be inviolable interfered with the effective dissolution of the offending combination of a railway company and a coal company. The opinion is not reported, but we have been furnished a certified copy of the memorandum opinion and its language is so pertinent that we quote it as expressing our view:

" One who takes a mortgage upon several items of property of such character that their common ownership or operation may offend against the Anti-Trust Law or the commodities clause, and such that the mortgage serves practically to aid in tying them together, must be deemed to hold his mortgage subject to the contingency that if the complete and final separation of one item of the mortgaged property from the remainder becomes essential to the due enforcement of either named law, the court charged with such enforcement may take control of that item, free it from the consolidating tendency of the mortgage, and substitute therefor its judicially ascertained equivalent. Otherwise the mortgage will stand as the ready means of restoring—or at least tending to restore—

those conditions which the court is endeavoring to destroy. It may well be true that a railroad and a coal company under common ownership and management are worth more as security under a mortgage than when independent, and that their effective separation does impair the mortgage security, but this can not make the law helpless."

We have no desire to vary the security of the bondholders more than seems necessary to effect fully the purpose of the law, and wish to recognize their equities as against the two companies and the stockholders, as will later appear.

We think that the plan should be changed in accord with the following suggestions. The District Court should, after a hearing of all interested parties, determine the respective values of the properties of the merged Reading Company and the Coal Company which are subject to lien of the general mortgage. Then the decree should direct that the liability of each on the bonds and the pledge under the mortgage shall be modified as between the mortgagee and the mortgagors, so that the liability of the Reading Company on the bonds outstanding, and the lien of the mortgage upon that company's property to secure them, shall be reduced to an amount proportionate to the ratio of the value of its pledged property to the value of all the property pledged including that of the Coal Company. The obligation of the Coal Company upon such bonds and the lien upon its property to secure them should be reduced in corresponding proportion. The amount that each company is to pay as interest should be similarly fixed, and specific provisions for foreclosure of these separate liens on default and requisite machinery and other necessary changes to carry out the result will be made by the District Court in its discretion. By this arrangement the interests and joint obligations of the Reading Company and the Coal Company will be completely severed and the purpose of this court carried out.

The Reading Company's first plan contemplated the securing of a voluntary release of the Coal Company's property by the bondholders through payment of ten per cent. of the par value of his bonds to each bondholder; but the proposal did not meet with favor. We leave it to the District Court to determine what, if any, injury to the security this modification of the terms of the debt and mortgage may cause and to compensate for it by such a payment to the bondholders by either or both companies as may seem equitable and convenient.

The changes involved in these suggestions may interfere with, or make inapplicable, the provisions of the present plan looking to a proper working capital for the Reading Company. Authority is therefore given to the District Court to amend the plan in any way which seems wise to leave the Reading Company properly financed to meet its obligations to the public.

It does not seem necessary to change the general form of that feature of the plan by which, through the distribution of certificates of interest to the stockholders of the old Reading Company in the stock of the new Coal Company, the stock relations of the old Reading Company and the present Coal Company are to be ended, though we would not limit the power of the District Court in this regard. It may be found necessary to increase the price of two dollars per share in the Reading Company which the recipients of the certificates of interest in the stock of the new Coal Company are to pay therefor, in order to reserve more cash to the Reading Company in that transaction; but this the District Court can determine. The adopted plan was nicely adjusted to secure a practical working basis for both companies, and we would not embarrass the District Court, after a full hearing of all the parties, in the detailed changes which it may find practically necessary to adopt in following the general outlines of our modification of the plan.

We think it not unreasonable to accept the suggestion made at the bar, namely, that not only shall the stockholders of the Coal Company upon receiving and registering their stock be required to make affidavit that they have no stock ownership in the Reading Company and are not acting for, or representing, anyone who has, but also that the merged Reading Company shall be required to adopt a by-law effective till the further order of the court permitting registration of transfers of shares of its capital stock in the names only of persons who shall make affidavit that they are not stockholders, registered or actual in either the new or the old Coal Company, and have not been and are not holders of proxies to vote shares of stock therein.

As to the New Jersey Railroad Company and the Wilkes-Barre Coal Company, we have heard no criticism and the provisions as to them are approved. By the decree, the new Coal Company, its officers and directors are enjoined from voting the Coal Company stock so as to form a combination between the Coal Company and the Reading Company. The Reading Company and all persons acting for or in its interest are perpetually enjoined from acquiring, receiving, holding, voting, or in any manner acting as the owner of any shares of the new Coal Company; and the new Coal Company and all persons acting for it are enjoined from acquiring, or voting, any of the shares of the Reading Company. The Coal Company will be permanently enjoined from issuing to the Reading Company, and the Reading Company from receiving, any stock, bonds, or other evidences of corporate indebtedness of the Coal Company. On default the trustee of the mortgage is required to vote the Coal Company stock so as not to bring about a recurrence of the conditions condemned in this cause, and if it shall be necessary to sell the properties they are to be sold to different interests. The Attorney General and his successors in office

are given by the decree full opportunity to keep a watch upon the relations between the two companies and to appeal to the court for prompt enforcement of the injunctions of the decree as they may be advised. The court retains large control of the decree with power to assure its continued efficacy by the summary remedy of contempt. With these restrictive provisions and the modifications of the plan outlined above, we think that the independence of the four companies will be fully achieved.

We come now to the issue upon which these appeals were brought here. It concerns the respective rights of the common stockholders and the preferred stockholders in the assets of the Reading Company. They all, under the plan, will receive the benefit of the difference between the real value of the privilege of disposing of their distributive certificates of interest in stock in the new Coal Company, and the payment of $2.00 or such other sum as may be fixed, per share held by them of the Reading Company stock. Such difference has already been the subject of sale and quotation on the market in New York and has varied from $11 to $20. This might have been expected in view of the disparity between par of the capital stock of the Reading Coal Company and the far greater actual value of its properties. The disparity shows that while the transfer of certificates of interest in the new Coal Company stock is denominated a sale, it is only a distribution of the surplus or assets of the Reading Company to its stockholders made necessary by the decree of this court in taking the Reading Company out of the coal business and restricting it to that of owning and operating a railroad system. The Reading Company by merger with the Reading Railway Company is made to change its character. Under the plan it must comply with the Act of May 3, 1909, Penn. Laws, 408, by which, in merging with the Reading Railroad Company, it becomes a new corporation. *Pennsylvania Utilities Co.* v. *Public Service Commission,*

69 Pa. Super. Ct. 612; *Lauman* v. *Lebanon Valley R. R. Co.,* 30 Pa. St. 42, 45; *Clearwater* v. *Meredith,* 1 Wall. 25; *Railroad Co.* v. *Georgia,* 98 U. S. 359; *Yazoo & Mississippi Valley Ry. Co.* v. *Adams,* 180 U. S. 1; *Shields* v. *Ohio,* 95 U. S. 319.

What is to be done is in fact and law a liquidation of the assets of the old Reading Company. Its stockholders receive their distribution in kind by retention of the stock they held in the old Reading Company as stock in the reduced new Reading Company, purged of its offense against the law, together with the distributive values of that which the old Reading Company has been compelled to get rid of, *i. e.,* the ownership of the stock of the Coal Company. The distribution of certificates of interest in the new Coal Company shares was evidently given the form of a sale to enable the new Reading Company to realize out of it $5,600,000 in cash to give it additional working capital enough properly to operate the Reading Railway System. But this does not change its real nature as a mere distribution of forbidden assets in kind to stockholders.

The rights of the common and preferred stockholders of the Reading Company *inter sese* are to be determined by the organization agreement of 1896. At that time, under a special charter of a corporation known as the Excelsior Enterprise Company granted by the Pennsylvania Legislature in 1871, the Reading Company, by change of name, came into being. The capital stock was increased to $140,000,000 divided into 2,800,000 shares of the par value of $50 each. Half of these were preferred, $28,000,000 first preferred, and $42,000,000 second preferred. The other half or $70,000,000 were common, and the rights of the preferred and common stock were fixed by agreement. Each share of stock, whether common or preferred, had a vote. The agreement provided that the preferred stock should be entitled to non-cumulative dividends "at the

9545°—23——12

rate of, but not exceeding, four per cent per annum, in each and every fiscal year, in preference and priority to any payment in or for such fiscal year, of any dividend on other stock; but only from undivided net profits of the Company when and as determined by the Board of Directors, and only if and when the Board shall declare dividends therefrom. If, after providing for the payment of full dividends for any fiscal year on the First Preferred Stock, there shall remain any surplus undivided net profits, the Board out of such surplus may declare and pay dividends for such year upon the Second Preferred Stock. If, from the business of any particular fiscal year, excluding undivided net profits remaining from previous years, after providing out of the net profits of such particular fiscal year for the payment of the full dividends for such fiscal year on the First and Second Preferred Stock, there shall remain surplus net profits, the Board of Directors may declare, and out of such surplus net profits of such year may pay, dividends upon any other stock of the Company. But no dividends shall in any year be paid upon any such other stock out of net profits of any previous fiscal year in which the full dividends shall not have been paid on the First and Second Preferred Stock."

The company was given the right at any time to redeem either or both classes of its preferred stock at par in cash, if such redemption should then be allowed by law and after payment of dividends of 4 per cent. for two successive years on the first preferred stock, to convert the second preferred stock not exceeding $42,000,000, par value, one-half into first preferred stock, and one-half into common stock, and to increase its first preferred and common stock to the extent necessary to effect such conversion. The company never exercised the right to convert or redeem the preferred stock.

It will be observed that the preferred stock and the common stock with 1,400,000 shares of each were thus

given an equality of voting power which could not be changed without the consent of the company, and that it has not been changed either by conversion or redemption.   This would seem to have been designed to preserve an equilibrium of control in which reasonable dividends out of profits when they accrued in sufficient amount would be voted to the common stockholders on the one hand, and proper additions would be made out of earnings to the capital of the company to increase its future profit-earning capacity and create a greater security for a constant payment of dividends to preferred stockholders.   Of course there would not be block voting of the two classes of stock but the division did tend to secure a fair representation of both interests in the board of directors.

The effect of the agreement as to dividends upon the preferred and common stock seems to us clear.   It emphasizes that dividends are to be paid only out of undivided profits and when and as determined by the board of directors and only if and when the board shall declare them.   It leaves to the board to determine in its discretion whether the undivided profits shall be put in surplus working capital or in dividends.   The limitations on the discretion of the board are that the first and second preferred can not receive more than four per cent. in any fiscal year, and that neither the second preferred nor the common stock can receive any dividend until the first preferred dividend has been paid in full each year and the common stock receives nothing until the second preferred dividend is thus paid.   The words describing the condition upon which the power of the board to declare dividends on the common stock can be exercised, show that each year's profits are to be considered by themselves in the distribution of dividends between the stock.

Appellants, however, rely on the final words of the clause to show that it is intended that net profits in any past year can be thereafter allowed to the common stock

if in that past year the preferred stock had been paid full dividends. We do not find it necessary to decide that the board of directors has not such power; but if so, the power is not one the exercise of which can be compelled in the absence of fraud or breach of trust. The failure of the board to exercise it, and the application of the earnings to surplus determine such earnings to be assets as of the time of the compulsory winding up and liquidation of the corporation. The power to declare dividends not exercised can have no more effect upon the rights of the preferred stockholders to share in the existing assets of the corporation when liquidated than the failure of the company to convert preferred stock into common, or to redeem the preferred stock at par. The proper interpretation of the agreement is that, after the declaration of dividends for any current year, the undivided earnings are to be regarded as capital assets and to be distributed on liquidation, unless the board of directors has meantime applied them as dividends. If the argument of appellants were carried to its logical result, all the net earnings of the Reading Company in twenty-five years no matter how invested or applied to increasing the earning capital, must in a liquidation be treated as undistributed profits to go entirely to the common stock without any action of the board of directors. This is impossible.

The record discloses that in 1904, when the Reading Company made its application to the New York Stock Exchange to have its stock listed, it contained the following statement:

" The Preferred and Common stocks have equal voting power and in liquidation or dissolution of the corporation will share equally in *pro rata* distribution of assets."

Coming as this must have come from the representatives of both the preferred and common stockholders, it is significant evidence of what they then thought of their

respective rights and has the additional weight of a representation to future purchasers of the two classes of stock as to the kind of interests they were buying in the company.

Our conclusion that the claim on behalf of the common stockholders is invalid is based on the construction of the words of the agreement itself and hardly needs authority to sustain it. It is, however, in accord with the general common-law rule that stockholders common and preferred share alike in the assets of a liquidating corporation, if the preference is only as to dividends. *Hamlin* v. *Toledo, St. L. & K. C. R. R. Co.*, 78 Fed. 664, 672, opinion by Mr. Justice Lurton, then Circuit Judge; *Toledo, St. L. & K. C. R. R. Co.* v. *Continental Trust Co.*, 95 Fed. 497, 531; *Guaranty Trust Co.* v. *Galveston City R. R. Co.*, 107 Fed. 311, 318; *Birch* v. *Cropper*, L. R. 39 Ch. D. 1; 14 App. Cas. 525; *In re Accrington Corporation Steam Tramways Co.* [1909], 2 Ch. 40; *Lloyd* v. *Pennsylvania Electric Vehicle Co.*, 75 N. J. Eq. 263; *Jones* v. *Concord & Montreal R. R. Co.*, 67 N. H. 119, 234; *Drewry Hughes Co.* v. *Throckmorton,* 120 Va. 859. This is the rule in Pennsylvania. *North American Mining Co.* v. *Clarke,* 40 Pa. St. 432. The cases in which a different conclusion has been reached are where the contract or law determining the rights of the preferred stockholders has an express or clearly implied restriction as to the share which they may take in the assets on liquidation. *Niles* v. *Ludlow Valve Mfg. Co.*, 196 Fed. 994; *Russell* v. *American Gas Co.*, 152 App. Div. 136.

Counsel for one of the appellants has called attention to the fact, not appearing in any assignment of error, that among the assets of the old Reading Company which the new Reading Company will continue to hold is one million dollars par value and of much greater actual value in the stock of the Reading Iron Company, an iron manufacturing company, and that under the constitution of Penn-

sylvania it will be unlawful for the new Reading Company as a railroad company to continue to own it. Questions as to the propriety and legality of this holding of the old Reading Company did not arise when the case was before this court originally and do not arise on the record before us now in any such way as to enable us to say whether the federal commodities clause or the constitution of Pennsylvania will thus be violated in carrying out the plan by which the Reading Company is to become a railroad company. This must be determined by the District Court in further hearings and consideration at the time the final decree comes to be settled in accordance with our mandate, when it will have authority to modify the plan in this respect to satisfy the requirements of law.

The decree of the District Court is affirmed with modifications already indicated and the case is remanded for further proceedings in conformity to this opinion

*Affirmed with modifications.*

Mr. Justice Brandeis took no part in the consideration or decision of this case.