NATIONAL BANK OF UNION POINT *et al. v.* AMOSS *et al.; et vice versa.*

1. A subscriber to stock in a corporation to be formed "for the purpose of organizing the Sparta Cotton Mill," where the subscription agreement contained no reference to the scope, extent, or nature of the business beyond limiting the capital stock to a fixed sum, but did contain a provision that a named person would sell for a stated sum, to the subscribers, the property of the Sparta Oil Mill, is not released from his subscription because the charter subsequently granted empowers the corporation "to conduct such branch establishments and business as are found to be useful to the main enterprise;" the main enterprise, as stated in the charter, being the manufacture and sale of cotton goods, yarns, thread, and cloth.

2. Where a promoter solicited subscriptions to a corporation to be formed, and presented to the prospective subscriber a subscription agreement containing a provision that the promoter undertook and agreed that a certain corporation would sell to the subscribers certain property for a stated sum, and no misrepresentation of fact was made, nor any trick or device practiced by the promoter to secure the subscription, in a suit by the corporation and its officers to wind up its affairs, adjust the liabilities of the holders of stock and subscribers to stock, and distribute the corporate assets, subscribers will not be released on the ground that their subscription was procured by alleged fraud of the promoter, who had largely overvalued the property in the subscription contract, and who was a large owner of stock in the corporation which owned the property.

3. Where promoters enter into a secret and collateral agreement with a

person to induce him to subscribe for stock of a corporation to be formed, the breach of such agreement will not release the subscriber from his liability to the corporation.

4. The withdrawal of a subscriber before the minimum stock subscription is reached does not vitiate the other subscriptions not so withdrawn.

5. Where a subscription agreement to form a corporation provides for the issuance of preferred and common stock, and that the subscriber is to designate the class of stock to which he subscribes, an undesignated subscription will be deemed a subscription to common stock, unless a preference is asked prior to the organization of the corporation, or is given by unanimous consent of the stockholders after such time.

6. Preferred stock issued under charter authority and pursuant to proper corporate action, which provides that in case of liquidation or dissolution of the company, or distribution of its assets, it shall be entitled to be paid in full at par and accrued dividend charges, before any payment is made on the common stock, has a preference over common stock in the distribution of the assets of the corporation.

7. Where property is purchased by a recently formed corporation which fails to become a going concern, and there is no fraud in the sale and purchase, and the property is thereafter sold by order of the court in a pending proceeding to liquidate and distribute the corporate assets, the holders of the purchase-money obligation will not be denied payments from the proceeds of this and other corporate property solely on proof that the property was worth less than the agreed price.

8. The court did not abuse his discretion in refusing to approve the exceptions to the conclusions of fact filed by the defendants in error, upon which error is assigned in the cross-bill of exceptions.

DECEMBER 17, 1915.

Exceptions to auditor's report. Before Judge Park. Hancock superior court. September 30, 1914.

The Sparta Cotton Mill and its directors, who also sued as stockholders, brought an action against the other stockholders and creditors of the corporation, for equitable adjustment of the stockholders' liabilities and for marshaling and distribution of its assets. The petition alleged that the persons named as stockholders undertook to form a corporation, and signed the following subscription agreement: "Sparta, Georgia, March 27, 1907. For the purpose of organizing the Sparta Cotton Mill, a corporation to be capitalized at $100,000, as follows: $50,000 of preferred stock, and $50,000 of common stock, each class of stock to be of the par value of $100 per share, we, the undersigned, subscribe, and will pay for as called by the directors of the corporation, the amount set opposite our respective names (whether subscriptions are for preferred or common stock to be designated below). The preferred stock shall have preference both as to principal and

dividends, the dividends on the preferred stock to be seven per cent. per annum, and guaranteed, and no dividends shall be paid on common stock until after dividends on the preferred stock shall have been paid. In view of these preferences the preferred stock shall have no voting power, which power shall be vested entirely in the common stock, and the preferred stock shall. not share in the profits of the corporation beyond its annual dividend of seven per cent.; any profits that may be earned by the corporation in excess of this guaranteed dividend is to be paid only to the holders of common stock. If deemed advisable by a majority in amount of the subscribers hereto, the proportion of the preferred and common stock hereinbefore indicated may be changed so that there may. be a greater proportion of common stock, but in no event shall the preferred stock be more than fifty per cent. of the capitalization stated above. It is understood and agreed between the subscribers hereto and R. F. Bryan and J. W. Griffin, that the last-mentioned party will, for and in consideration of the sum of forty-two thousand ($42,000) dollars, convey. by warranty deed, free from all liens or incumbrances, to the subscribers . hereto all the lands now owned by the Sparta Oil Mill, except the oil machinery and property strictly pertaining to the oil business and ginhouse and ginnery, same being detached and in no way interferes with the cotton-mill property, which is to be removed within a reasonable time from its present location. The subscriptions hereto shall become binding and effective when seventy-five per cent. of the total capitalization of the corporation shall have been subscribed." On June 24, 1907, a charter having been obtained, the corporation was organized, officers elected, and by-laws for the government of the institution were passed. At this meeting it was ascertained and spread upon the minutes that 224 shares were to be preferred stock and 454 shares were to be common stock; and a form of certificate was devised and adopted to define the status and the rights of the preferred stockholders, and the same was spread upon the minutes. Calls for the payment of the stock subscriptions were duly made, and notice given to each stockholder. The directors purchased from the Sparta Oil Mill the property described in the subscription agreement (known as the Montour Mills property), except the power-plant, for the sum of $37,000. The power-plant was deemed inadequate for the

purposes intended, and the purchase-price was reduced $5,000. Some of the subscribers paid for their stock in full, some in part, and some have not paid. The directors made ineffectual efforts to operate the property, and in so doing incurred certain debts. It was difficult to get a meeting of the stockholders, but finally a majority of the common stock and 95 per cent. of the shares of the preferred stock were represented at a meeting held on February 23, 1911, at which meeting, after re-electing petitioners as directors, the stockholders voted to liquidate the affairs of the company; and this petition is filed for the purpose of marshaling and distributing the assets upon equitable principles, and for other relief ancillary thereto.

Certain of the defendants filed answers, and the case was referred to an auditor. Afterward the answer was amended by alleging that the defendants were not bound by their contracts of subscription, for the reason that there is a radical and fundamental difference between the charter and the subscription agreement. The plaintiffs demurred to so much of the original answer and amendment as set up fraud in the procurement of the stock subscriptions, and to so much as averred a variance between the subscription agreement and the charter. The auditor sustained the demurrer. The auditor made his report, and exceptions of law and of fact thereto were filed by the defendants. The court rendered the following judgment: "And now, in open court, upon the auditor's report in said case, as modified by the decision of the judge on exceptions thereto, it is finally considered and adjudged and decreed as follows: The defendants answering in this case and setting up the variance of the charter from the contract of subscription are discharged from further payment on said subscriptions, and said unpaid subscriptions are not assets of the Sparta Cotton Mill. The note of Sparta Cotton Mill to Sparta Oil Mill for $2,421.26 (balance of principal), appearing from the evidence to be a part of the purchase-price of Montour Cotton Mills and allowed by the auditor as a valid obligation of the Sparta Cotton Mills, is disallowed as such, and the interventions filed for the purpose of applying said debt to judgments against Sparta Oil Mill are refused and disallowed. The intervention of National Bank of Union Point, alleging its debt against Sparta Cotton Mill to be secured by collateral notes therein set out and in evidence,

is retained for the purpose of enforcing said collateral should the debt be not fully paid otherwise; and the parties to this case interested in said intervention are retained for that purpose. The fund raised by the sale of Montour Mills property on June 2, 1914, is to be administered as provided by previous judgments, save as modified hereby, the cost of the case being therein provided for. The valid debts of the corporation being thus fully provided for, the directors and officers of Sparta Cotton Mill, petitioners herein, appearing to have honestly discharged their duties, are discharged from further liability. This Sept. 30, 1914."

Exception is taken to so much of the judgment as held that the defendants were discharged on their subscription agreement because of its variance from the charter of the corporation; to so much thereof as undertook to rule that E. A. Rozier, R. F. Bryan, J. W. Griffin, and John D. Walker were not entitled to their subscriptions allowed by the auditor, being found to arise from their participation as stockholders of the Sparta Oil Mill in the purchase of the cotton-mill property sold by the oil-mill to the Sparta Cotton Mill; to so much of the decree as disallows the note of the Sparta Cotton Mill to the Sparta Oil Mill for $2,421.26, as an indebtedness against the Sparta Cotton Mill; and to the discharge of all stock subscriptions which had not been paid in, without providing for either the equalization or repayment of preferred-stock payments. The defendants except to so much of the judgment as overruled their exceptions of law and fact other than those sustained by the court.

*Samuel H. Sibley, R. L. Merritt,* and *Burwell & Fleming,* for plaintiffs in error in main bill. *Allen & Pottle, R. W. Moore, T. M. Hunt,* and *R. H. Lewis,* contra.

EVANS, P. J. (After stating the foregoing facts.)  1. About six years after the incorporation of the Sparta Cotton Mill, and pending the present action to wind up its affairs and to equitably adjust the liabilities of the stockholders and to distribute its assets, the defending stockholders, by amendment, pleaded a release from their subscription contract, on the ground that they subscribed to a capital stock in a corporation to be formed for the purpose of building and operating a cotton-mill in the city of Sparta, whereas the charter of the corporation provided for authority to construct and operate cotton-mills in places other than the city of Sparta,

and in places other than the county of Hancock. The charter was applied for by some of the subscribers in behalf of themselves and their associates, who prayed to be incorporated under the name and style of "Sparta Cotton Mill." The particular business to be carried on was stated to be the manufacture and sale of cotton goods, yarns, thread, and cloth, and the principal office of the corporation was to be at Sparta in the county of Hancock. The fifth paragraph of the application is as follows: "Besides the right of separate corporate existence, the right of perpetual succession, to elect officers and make by-laws, to sue and be sued, to have and use a common seal, and all other powers and rights usually incident to corporations, your petitioners desire the right to purchase and own and transfer and sell real and personal property for the purposes or in the course of its business, *to conduct such branch establishments and businesses as are found to be useful to the main enterprise,* and to do all other things reasonably necessary to the successful conduct of its manufacturing business aforesaid." Applicants were incorporated with the powers as prayed in their application. The contention is that the corporate power under the fifth paragraph is an enlargement of the purposes stated in the subscription, and constitutes a fundamental and radical variance.

A subscription to the capital stock of an intended corporation becomes a binding contract when the corporators accept the charter granted in conformity with the purposes and powers as described in the subscription agreement. 1 Thomp. Corp. § 521. A subscriber will not, without his consent, be compelled to pay money toward the formation of a corporation for an additional and distinct purpose. If the powers as expressed in the charter are proper and convenient means directly tending to the accomplishment of the main purpose as set out in the subscription agreement, and do not amount to the transaction of a separate and independent business, there is no variance. 3 Thomp. Corp. § 2117. This is but another application of the principle that although corporations have only such powers as are granted in the charter, yet where an express power is granted, this carries with it the right to do any act which may be found reasonably necessary to effectuate the power expressly granted. What is and what is not too remote from the main purpose must be determined by the particular facts of each case. *Snook* v. *Georgia Improvement Co.*, 83 *Ga.* 61

(9 S. E. 1104). An increase of the capital stock is a fundamental change. *Atlanta Steel Co.* v. *Mynahan,* 138 *Ga.* 668 (75 S. E. 980). A change in the route and shortening the line of a railroad company is material. *Winter* v. *Muscogee R. Co.,* 11 *Ga.* 438. But the alteration of a railroad charter authorizing a change in the location of the road, and the actual change of it, if consistent with the original design and object of the enterprise, not materially varying the route or abandoning a terminus actually established at the time of subscription, will not release a stockholder from his subscription, though made without his consent. *Wilson* v. *Wills Valley R. Co.,* 33 *Ga.* 466. The conduct of a "supply store" by a manufacturing company is not an independent business and ultra vires of the charter. *Searight* v. *Payne,* 6 Lea, 283; *Dauchy* v. *Brown,* 24 Vt. 197. In *Comanche Oil Co.* v. *Browne,* 99 Tex. 660 (92 S. W. 450), the subscription contract stated that the purpose of the enterprise was "to erect, own, and operate a cottonseed oil-mill." The subsequently obtained charter stated it thus: "The purpose of said corporation shall be to operate a cottonseed oil-mill; and to do all other things necessary and incident to the maintenance and operation of the cottonseed oil-mill business; and to erect, own, and operate whatever cotton-gins may be necessary and proper for feeders for said oil-mill." The court held the subscription binding, inasmuch as the charter did not empower the corporation to operate cotton-gins as a business independent of their necessity as a support of the oil-mill business. In the instant case the charter authorizes the corporation "to conduct such branch establishments and businesses as are found to be useful to the main enterprise." What is the main enterprise? It is the conduct of a cotton-manufacturing business. No business can be done under this charter, except it be in furtherance of and useful to manufacturing cotton into yarn, thread, and cloth, and the sale thereof. The subscription contract does not in terms locate the accessorial branch establishments in Sparta or in Hancock county; and in order to confine such to either of these localities, an exclusive inference must be drawn from the subscription agreement. The only data on which such an inference can be based is the name to be given the proposed corporation as "Sparta Cotton Mill," and the promise in the subscription contract that a named person would sell to the intended corporation the Sparta Oil Mill property for

a stated sum. Suppose that promise was not effectuated, was it the purpose that the project of operating a cotton mill should fail? No such conclusion as that can be drawn from the subscription agreement. On a comparison of the subscription contract with the charter, we do not think that there is such fundamental and vital variance as will release a subscriber from liability to pay for the stock subscribed by him. The facts of the case of *Midland City Hotel Co.* v. *Gibson,* 11 *Ga. App.* 829 (76 S. E. 600), are widely different from the case at bar, and it does not conflict with the ruling herein made.

2. The defendants pleaded that their subscription to the capital stock of the corporation to be formed was obtained by fraud. The facts relied on to constitute fraud were, that J. W. Griffin, R. F. Bryan, and E. A. Rozier, being the owners of a majority of the stock in the Sparta Oil Mill, which owned and unsuccessfully operated an oil-mill on the property known as the Montour Mills property, conceived the plan to unload that property at an excessive price on the public, and conspired to promote the organization of a cotton-mill company for that purpose; that in pursuance of the conspiracy Griffin solicited subscriptions to the Sparta Cotton Mill, a corporation to be formed, and presented to the subscribers the subscription agreement appearing in the statement of facts for their signatures, which agreement was written on two pages of paper and was so ingeniously prepared that none of the subscribers were advised of its real contents; that Griffin was a persuasive talker, and, in presenting the matter to the subscribers, represented that it was the purpose of the promoters to establish and operate a cotton-mill in the City of Sparta, but did not inform them that it was the intention of the promoters to buy the Montour Mills property. The defendants do not aver that there was any actual misrepresentation of the contents of the subscription agreement which they signed. Neither do they aver that any trick or device was practiced upon them to prevent their reading it. This plea was properly dismissed on demurrer. *Chicago Building &c. Co.* v. *Summerour,* 101 *Ga.* 820 (29 S. E. 291) ; *Walton Guano Co.* v. *Copeland,* 112 *Ga.* 319 (37 S. E. 411, 52 L. R. A. 268).

3. One of the defendants, John D. Walker, alleged that he was induced to subscribe on account of a collateral agreement he had with Griffin. In substance that agreement was, that Griffin and his

colleagues, controlling the Sparta Oil Mill, would sell to him 30 shares of the capital stock of the oil-mill; that from the proceeds of the payment by the subscribers to the Sparta Cotton Mill of the purchase-price of the Montour property the Sparta Oil Mill would declare a dividend of 80 per cent. on the 30 shares of oil-mill stock; that Walker would only be required to pay the difference, and would have the right to elect at any time whether to take preferred or common stock; and that the Sparta Oil Mill would immediately pay a debt due by it to a bank of which he was president and on which he was liable. This agreement was with the consent of W. T. and R. F. Bryan and E. A. Rozier, directors of the oil-mill. Griffin and his associates refused to comply with their agreement; whereupon Walker alleged that he repudiated the contract, and pleaded the breach of this agreement in bar of a recovery on his subscription contract. Where promoters enter into a secret and collateral agreement with a person to induce him to subscribe to the capital stock of a corporation to be formed, even where valid and enforceable against the promoters, it is not valid as against the corporation. 10 Cyc. 414, 415.

4. Exception is taken to the auditor's finding that the withdrawal of a subscriber before the minimum stock subscription was reached did not vitiate the other subscriptions not so withdrawn. The preliminary agreement to form a corporation and take stock therein is not a contract by the subscribers with each other. It is a mere offer to the corporation not yet in existence, and is revocable by any subscriber until the organization of the corporation, which operates as an acceptance of the offer. 1 Thomp. Corp. § 543; *Allen* v. *Hastings, 2 Ga. App.* 291 (58 S. E. 504). It follows that as all of the subscriptions are mere offers, the withdrawal of one offer will not affect the others.

5. In his findings of law the auditor reported that the undesignated stock subscriptions should be held and deemed subscriptions for common stock, unless a preference had been asked prior to the organization, or was given by the unanimous consent of all stockholders subsequent to such time. The subscription agreement contemplated that the subscribers should designate whether their subscription was for preferred or for common stock; and this was done by many subscribers. Some did not indicate for which class of stock they subscribed, and assert that they have a right of election

after the organization of the corporation. The usual relation between a corporation and its stockholders is that of holders of common stock. It requires a special agreement to demand preferred stock. The subscribers who did not designate the class of stock to which they subscribed were liable as common stockholders when the corporation was formed. Thereafter the right to an issue of preferred stock would depend, as the auditor held, either upon unanimous consent or corporate action. Cook on Corp. §§ 268, 269.

6. The auditor reported, "that, the Sparta Cotton Mill having become insolvent, all unpaid subscriptions both on common and preferred stock constitute a trust fund for the benefit of creditors; that if no assessments of preferred stockholders be necessary for the benefit of creditors, then the unpaid common stock subscriptions are liable, first to the creditors, second to the preferred stock paid up, and finally common stockholders are liable under their subscriptions for assessments among themselves, according to their respective rights, in proportion to the amounts already severally paid, in order to equalize such payments." It will be remembered that the subscription contract contained this provision: "The preferred stock shall have preference, both as to principal and dividends," etc. The evidence before the auditor authorized a finding, and the auditor found as a matter of fact, that the stockholders accepted the charter, organized the corporation, elected officers, and ordained by-laws. At the October, 1907, meeting the directors adopted a prescribed form for the preferred stock, which contained this provision: "In case of liquidation or dissolution of the company, or distribution of the assets, the preferred stock shall be entitled to be paid in full at par, and accrued dividend charges, before any payment is made on the common stock. After such payment the common stock is entitled to the total remaining assets." In a subsequent meeting of the stockholders, held on July 14, 1908, a resolution was passed and duly entered upon the minutes, declaring that the preferred stock certificates adopted by the directors were in accordance with the original subscription list, and the same was approved and adopted by the stockholders. Subsequent meetings were held, in which holders of common and preferred stock issued under this authority participated. The general rule is, that, in the absence of any special stipulation either by statute or by agreement, the holder of preferred shares is entitled to preference

only in the distribution of dividends, and not in the distribution of capital. The matter may be governed by a contract which will give the holder of preferred stock a preference in the distribution of assets. 4 Thomp. Corp. § 3613. The conclusion of the auditor, giving a preference to preferred over common stockholders, was in accordance with the contract between the corporation and the stockholders.

7. The Sparta Oil Mill held the note of the Sparta Cotton Mill for a balance of $2,421.26. The indebtedness represented by this note was allowed by the auditor as a valid obligation of the Sparta Cotton Mill. The court in his judgment reversed this finding of the auditor. That indebtedness arose in this way: In March, 1907, J. W. Griffin, R. F. Bryan, and E. A. Rozier were the principal owners of the Sparta Oil Mill. The oil-mill owned the property known as the Montour Cotton Mills property. This property had been purchased about four years before, for the sum of $9,000. It was located some distance from a railroad. In March, 1907, Griffin solicited subscriptions for the cotton-mill. Griffin, Rozier, and John D. Walker each subscribed for $5,000, and Bryan subscribed for $10,000 of the stock. The subscription-list contained an option to purchase this property at $42,000. The Sparta Cotton Mill was incorporated on June 24, 1907. The corporation was duly organized, officers were elected, and by-laws adopted. At a meeting of the stockholders a resolution was passed and entered upon the minutes, confirming the purchase of the Montour Mills property for $37,000 (the price being reduced $5,000 in consideration of eliminating the power-plant, which was deemed inadequate). The title of the property was investigated, and a deed was made to the Sparta Cotton Mill in consideration of $37,000. Of this amount $17,000 was paid in money and notes, and $20,000 was taken in stock by the owners of the oil-mill. The auditor found that the value of the oil-mill property at the time of the subscription and at the time of its sale was about $15,000, and that that value would propably be enhanced $7,500 on account of its availability for cotton-mill purposes. At the same time the auditor found that the sale of the Montour property by the Sparta Oil Mill to the Sparta Cotton Mill was free from fraud. As stated in his opinion, the trial judge held, on the principle that he who seeks equity must do equity, that inasmuch as the owners of the Sparta Oil Mill stock

had already received $17,000, the value of the property as found by the auditor, they were not entitled to recover the balance of the purchase-money represented by the note. It is true that in the distribution of the assets of an insolvent corporation it will be done equitably. But it is not equitable that a clear property right shall be taken away from one man to lessen the misfortune of a disastrous financial venture of his associates. This is not a question of rescission of the contract on the ground of inadequacy of price. The Sparta Cotton Mill bought the property at an agreed price. The auditor found that there was no fraud practiced in its purchase, and the trial judge approved that finding, after an elaborate review of the evidence. The fact that the auditor was of the opinion that the property was of less value than the parties contracted to pay for it will not justify the court in reducing the price which the parties to the contract had agreed upon. Indeed, by an interlocutory order passed prior to the final judgment complained of, the court had directed that this property be sold as the property of the Sparta Cotton Mill; and the proceeds of the sale are a part of the assets to be distributed. The trade never was rescinded, but was held to the very last; and under these circumstances we think the court erred in disallowing this item as a valid obligation.

8. The auditor made his report pursuant to the statute, separately classifying his conclusions of law and of fact. We have noticed all of the exceptions of law upon which assignments of error have been made in the cross-bill of exceptions, dealing with the principle rather than with the specific exception; and we concur with the trial court in sustaining the auditor in those findings of law to which exception is taken in the cross-bill. We have also examined the evidence, and the exceptions to the conclusions of fact. The evidence warranted, and in many cases demanded, the particular finding; and there was no abuse of discretion in overruling the exceptions to the conclusions of fact upon which error is assigned in the cross-bill of exceptions.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. All the Justices concur.*