Thomas R. Tennant, Appellee, v. Harry Epstein et al., Appellants.

Gen. No. 8,531.

Opinion filed May 25, 1933.   Rehearing denied June 30, 1933.

WALTER BACHRACH and HALL & HULSE, for appellants; WALTER BACHRACH and ARTHUR MAGID, of counsel.

PAUL MACGUFFIN and KIRKLAND, FLEMING, GREEN & MARTIN, for appellee; PAUL MACGUFFIN, J. FRED REEVE and J. B. MARTINEAU, JR., of counsel.

MR. PRESIDING JUSTICE WOLFE delivered the opinion of the court.

Harry Epstein, his wife Anna Epstein, and their son Chester Epstein, are the owners of the majority of the shares of the capital stock of the Grayslake Gelatin Company, an Illinois corporation. They and the said Gelatin Company are the appellants herein. The Epsteins are also directors and officers of the corporation. Harry Epstein is the president and treasurer, and Chester Epstein vice president and secretary. Their interests in the corporation and this suit are commutual and they are referred to by counsel on both sides as the ''Epsteins'' and they will be so designated in this opinion when the name is appropriate. The appellee, Thomas R. Tennant, was the complainant below and he will be so named herein.

During the year 1921, and for 15 years prior thereto, the complainant was the plant manager of the United Chemical and Organic Products Company, manufacturers of glue and gelatin. About three years before 1921, Harry Epstein sold his shares of stock in the latter company, withdrew as its manager, and refrained from the manufacture of gelatin in compliance with his agreement with the said company, not to engage in such business for a period of one year after he sold his stock. During the latter part of 1921, Harry Epstein told the complainant, Thomas R. Tennant, that he desired to go into the business of making gelatin and he wanted the complainant to plan a plant

for him and become its manager. Harry Epstein and the complainant discussed the matter on several occasions and eventually with Hamilton Moses, an attorney, who was consulted by them at the suggestion of Harry Epstein.

Mr. Moses, undoubtedly, under an understanding between Harry Epstein and the complainant, was employed by them to draw the documents necessary to express in writing the oral agreements and negotiations between the complainant and Harry Epstein, relative to the new enterprise which they were about to launch. While it is anticipating to some extent a recital of the facts in the case, it is safe to say that it was the purpose of Mr. Moses, as an attorney, to prepare the necessary documents expressing the intentions of the complainant and Harry Epstein concerning the incorporation of the Grayslake Gelatin Company. The document was to state the terms of the employment of the complainant as manager of the new plant, and also the extent and amount of their interests in the new company.

The first document prepared by Mr. Moses was a contract dated December 1, 1921, which was duly signed by the complainant and Harry Epstein. This contract in express terms provided for the incorporation of the Grayslake Gelatin Company; the amount and character of stock to be held in the company by complainant and Harry Epstein; the employment of the complainant as manager of the plant for a period of five years at a monthly salary of $1,000; also that the complainant should receive 100 shares of common stock of the company at the end of each year during his employment as such manager; that Mr. Moses should draft the by-laws of the company.

Mr. Moses also prepared the statement of incorporation for the organization of the Grayslake Gelatin Company, which statement was signed by the com-

plainant, Harry Epstein and Anna Epstein. By-laws for the company were drafted by Mr. Moses and there was prepared in his office the certificates of shares of stock of the company. The preparing of these various documents, while not on the same date, was in fact the consummation of one transaction and of the common purpose of the parties to provide for and define their interests in the Grayslake Gelatin Co. The interpretation and construction of these documents are involved in this case.

The complainant testified that he had never met Mr. Moses before December 1, 1921, when he was introduced to him by Harry Epstein in the office of Mr. Moses. The complainant further testified that he was not represented by an attorney when the contract, the statement of incorporation, the by-laws and the certificates of stock were prepared by Mr. Moses; that it was not suggested to him by Mr. Moses nor Harry Epstein that he secure an attorney to represent him; that he had no connection with the preparation of the contract dated December 1, 1921. The complainant now points to this evidence and argues that in the construction of said documents that they should be construed most strongly against Harry Epstein because the words in the documents were used by Mr. Epstein through his attorney, Mr. Moses. It is necessary, therefore, to dispose of this contention of the complainant as a question of fact: "Is the wording of the contract exclusively that of Harry Epstein?"

The testimony of Mr. Moses is in direct conflict with that of the complainant on the point that the complainant never met him before December 1, 1921. Mr. Moses testified that he had a conference with the complainant and Harry Epstein on November 28, 1921, from 6 o'clock p. m. to 9:30 p. m., relative to the organ- ization of the Grayslake Gelatin Company, the appointment of the complainant as its manager and the terms of his employment, and the nature and extent of the

interests of the complainant and Harry Epstein in the company. This testimony of Mr. Moses is fully corroborated by the service sheets of his office which were admitted in evidence under the stipulation that they were made in the regular course of business and that the entries thereon are correct. Mr. Moses testified that the contract dated December 1, 1921, was a draft form and executed by complainant and Harry Epstein on December 6, 1921, and the contract delivered on the latter date to the Chicago Title and Trust Company; that he, Harry Epstein and the complainant discussed the provisions of the contract on December 6, 1921, and that changes were made therein. This testimony of Mr. Moses is also corroborated by the said service sheets. Mr. Moses further testified that he gave Harry Epstein the draft of the contract on December 1, 1921, and on December 5, 1921, he rewrote one page of the contract; that on December 6, 1921, the contract was changed in one particular at the request of the complainant; that this change in the contract is shown because part of the typewritten contract is single spaced.

The contract contains mutual promises on the part of the parties thereto. The complainant testified that he understood the contract dated December 1, 1921, and that it was in the same form as when he signed it. He signed the statement of incorporation and voted for the by-laws of the company. After considering all of the competent evidence in the record bearing on this question, we have come to the conclusion that the words of the contract, the articles of incorporation, the by-laws and the certificates of shares of stock, are the common language of both of the contracting parties and the contention that if there may be any ambiguity in these documents it should be construed against Harry Epstein, is not sustained by the evidence.

This is a case in chancery and the whole record is brought to this court for review. No question of pleading is involved, except that the complainant assigns as cross error that the chancellor erred in sustaining objections to his petition asking leave to file an amendment to his bill of complaint. The petition was filed after the hearing of the evidence in the case. The amendment was to incorporate in the bill the substance of the complainant's testimony that Harry Epstein had orally agreed with the complainant before the execution of the contract of December 1, 1921, to retire the preferred stocks out of the profits of the Grayslake Gelatin Company as soon as there was a sufficient surplus to retire the preferred stock. The chancellor held that the preliminary verbal negotiations and agreements of the complainant and Harry Epstein relative to the formation of the company and the retirement of the preferred stock were merged in the articles of incorporation of the company.

In view of the decision in the case of *Cratty v. Peoria Law Library Ass'n,* 219 Ill. 516, and *Hladovec v. Paul,* 222 Ill. 254, we are of the opinion that an agreement of complainant and Harry Epstein (since they were the owners of all of the stock), to retire the preferred stock out of said profits was not illegal; and that such an agreement would be valid independently of the terms of the articles of incorporation. We also note that by clause nine of the contract dated December 1, 1921, the complainant was given the option to purchase from said Harry Epstein an aggregate number of 425 shares of preferred stock of said company, during the term of his employment as manager. The proposed amendment, and the testimony of the complainant in substantiation thereof were to form, according to complainant's theory, the basis for a provision in the decree directing the Epsteins to retire the preferred stock of the company out of its profits.

The retirement of the preferred stock would have resulted in a division of all the profits of the company in the proportion of one-fourth thereof to the complainant and three-fourths to the Epsteins. This result, it is contended by the complainant, was the intention of Harry Epstein and the complainant as shown by their alleged oral agreement. The contention, therefore, is squarely based on the alleged oral agreement. Such a provision in the decree would have been in effect a reformation of the contract dated December 1, 1921, which clearly intended to express in explicit terms all the mutual, oral agreements and understanding of Harry Epstein and the complainant relative to the formation of the Grayslake Gelatin Company, the employment of the complainant as its manager and the extent and nature of his interest as a stockholder in the corporation.

More than 10 years after the contract was executed the complainant asks a court of equity to insert therein an alleged oral additional agreement made before or at the time the written agreement was signed. Furthermore, it appears from the evidence that during the five years when the complainant was the manager of the plant and a director of the company, the profits of the said company were accumulated before the expiration of the five years to an amount far in excess of the par value of the preferred stock. These facts may not constitute laches on the part of the complainant so that he is estopped to urge the existence of the alleged oral agreement, the Epsteins not having been prejudiced by the complainant's silence. However, the nonaction of the complainant and the lapse of time, are circumstances which the court takes into consideration in determining, from all the evidence in the case, if the complainant is entitled to an addition to the contract dated December 1, 1921, on the ground that the Epsteins either fraudulently or by design, or through

inadvertence of the parties, the alleged mutual oral agreement was not inserted in the written contract. The making of the alleged oral agreement is denied by Mr. Moses and Harry Epstein.

Contracts reduced to writing, entered into by both parties with regard to that solemnity, should not be lightly disturbed by the courts; the writing, when executed, becomes the repository of the agreement between the parties. All prior negotiations leading up to the execution of the contract are merged therein and parol evidence is not admissible to explain, contradict, enlarge or modify the writing as it existed when executed. *Schweickhardt v. Chessen,* 329 Ill. 637. In order to warrant the correction by the courts of a written agreement on the ground of mistake or fraud, the proof must be clear, convincing and satisfactory and that the party seeking the reformation was free from negligence. *Schweickhardt v. Chessen, supra; Skelly v. Ersch,* 305 Ill. 126. A court of equity proceeds cautiously in granting reformation of a written contract where the alleged error is denied. *Hall v. Hubbard,* 215 Ala. 653, 112 So. 235. We do not think it was error for the chancellor to deny the petition asking leave to amend the bill.

From what has been said in this opinion we hold as a matter of law that the evidence in the case is not such as to justify this court in granting the complainant any equitable relief predicated on any oral agreement, transaction or circumstance consummated, occurring or contemplated by the parties prior to the execution and not contained in the written document heretofore alluded to.

Independently of the two foregoing contentions of the complainant that the words of the document herein referred to should be most strongly construed against the Epsteins, and that the court should read the alleged oral agreement into the said document, the com-

plainant's claim to equitable relief rests upon the charge that at some time unknown to the complainant, the Epsteins entered into a conspiracy for the purpose of defrauding the complainant of his rights as owner of 500 shares of the common stock of the Grayslake Gelatin Company, and unlawfully diminishing his rights as a stockholder in the company and defrauding him of his interest of the surplus of the company and also for the purpose of unlawfully aggrandizing the interest of the Epsteins in the surplus and assets of the company by unfair, inequitable, fraudulent methods and manipulation.

The "fraudulent methods and manipulation" relied upon by the complainant is the charge that the Epsteins, as the owners of the majority of the capital stock of the Grayslake Gelatin Company, and as the directors of the company, brought about and declared a stock dividend distributable equally to the owners of both the preferred and common stock in proportion to their ownership of such shares.

There was a decree in favor of the complainant on the finding of the chancellor that the Epsteins were carrying out an unlawful plan to deprive complainant of his rights as the owner of 500 shares of the common stock of the company, and to diminish his rights and interest in the surplus of said company growing out of the ownership of the 500 shares of common stock. The evidence shows that all of the Epsteins took part in declaring the stock dividend and the distribution thereof among the stockholders. The shares of the Grayslake Gelatin Company have no market value. The shares of stock declared and issued as the stock dividend and delivered to the Epsteins are now and have always remained in the possession of the Epsteins as the absolute owners thereof. These facts lead us to the conclusion that the complainant is entitled to the intercession of a court of equity to deter-

mine if the aforesaid action of the Epsteins is in fact illegal, although the charge of conspiracy is not supported by the evidence in the case. In other words, a court of equity having jurisdiction of the parties and the subject matter of the suit, and the complainant having, it is charged, sustained an invasion of his legal rights by the joint action and mutual co-operation of the Epsteins, it is not essential that the charge of conspiracy be proved to authorize the court to retain jurisdiction of the case. *Martin v. Leslie,* 93 Ill. App. 44 (12 C. J. 584, secs. 104, 105).

From what has been said it must be clear that the court must now consider the question which is the chief contention between the parties to this suit, as to whether the action of the Epsteins in declaring a stock dividend in favor of both the preferred and common stockholders was contrary to the legal rights of the complainant. To decide this question there is involved a construction of the articles of incorporation of the Grayslake Gelatin Company, its by-laws, and the certificates of the shares of stock of the company. It must be conceded that the bare, legal question, if preferred stockholders are entitled to a stock dividend, is not free from difficulty. This is particularly true if there is an increase in the capital stock of the corporation to the amount of the stock dividend. *Thomas Branch & Co. v. Riverside & Dan River Cotton Mills,* 139 Va. 291, 123 S. E. 542; also *Riverside & Dan River Cotton Mills v. Thomas Branch & Co.,* 147 Va. 509, 137 S. E. 620.

Before making a statement of facts in the case at bar relative to the situation of the parties as stockholders in the Grayslake Gelatin Company, and the action of the Epsteins increasing the capital stock and declaring the stock dividend, it seems advisable to state two propositions of law which are indisputable.

First: "Corporations are creations of statute, having the right to exercise the powers and privileges

conferred upon them by law. Stockholders therein have only those rights fixed and defined by statute. Those who become stockholders in a private corporation become such upon the agreement and contract that their 'investment therein may be handled subject to the exercise of any and all powers conferred upon the corporation by law.'' ''A part of the stockholders of the corporations involved have no right to manipulate the stock and property under their management and control in violation of the trust reposed in them as stockholders, so that they acquire either an undue advantage or such stock and property on terms other and different from that accorded to minority stockholders who may not have agreed with their plan of management and control.'' *Voigt v. Remick,* 260 Mich. 198, 244 N. W. 446.

Secondly: Under the Constitution of Illinois, Art. XI, sec. 3, each share of stock of a corporation, irrespective of preferential rights, is a unit of voting. *People v. Emmerson,* 302 Ill. 300. The right of the stockholder to vote and thereby preserve his influence in the methods and policy of the corporation is substantial and of material value to the stockholder. *Hayes v. St. Louis Union Trust Co.,* 317 Mo. 1028, 298 S. W. 91; *Luther v. C. J. Luther Co.,* 118 Wis. 112, 94 N. W. 69; *Hammer v. Cash,* 172 Wis. 185, 178 N. W. 465.

Furthermore we have come to the conclusion, from the facts in this case, that the Epsteins and the complainant accepted their respective shares of stock in the Grayslake Gelatin Co. in reliance upon and subject to the articles of incorporation, the by-laws, and the certificates of stock of the company. In these documents is to be found the intention of the parties relative as to their rights, interests and privileges as stockholders of the company. We think the facts and circumstances surrounding the formation of the company, the relation at that time between Harry Epstein

and the complainant, and the respective amounts invested by them in the corporate enterprise, justify the view that their intention is to be found in said documents. This conclusion, we believe, finds support in the cases of *Cratty v. Peoria Law Library Ass'n*, 219 Ill. 516, and *Hladovec v. Paul*, 222 Ill. 254.

Equity and justice require that we look beyond the articles of incorporation to find the intention and purpose of these parties as stockholders in the Grayslake Gelatin Co. *Putnam v. Slayback*, 23 F. (2d) 406; *Miller v. M. E. Smith Bldg. Co.*, 118 Neb. 5, 223 N. W. 277. We are aware of cases holding that a by-law of a corporation in conflict with the terms of the articles of incorporation, is invalid. However, any alleged invalidity in this respect in this case should not be permitted to thwart the intention of the individual parties, nor prevent the court from placing itself in the position of the parties and having the benefit of the light which the relation of the parties, the circumstances and facts attending the formation of the company, and the subsequent action of the parties, shed on the question of their aforesaid intention. *People ex rel. Wallace v. Sterling Burial Case Mfg. Co.*, 82 Ill. 457. Nevertheless, we are bound in such inquiry by the terms of the documents wherein the intention of the parties is expressed, and the implications which may be clearly drawn therefrom.

The term ''preferred stock'' has no fixed and definite meaning, but the rights of a preferred stockholder are to be determined by the rights, powers and privileges accorded to him by the contract under which it is issued, the statutory provisions, if any, and the inherent rights of stock ownership. *Heller v. National Marine Bank*, 89 Md. 602, 73 Am. St. Rep. 212.

We have read many of the cases cited by counsel on both sides of the case in their extensive and carefully prepared briefs. They have been of great assistance

to this court in its attempt to arrive at a correct solution of this question, which is not without its complexities and which has never been passed upon by reported cases in all its phases, ramifications and implications. The rule that the rights of a preferred stockholder are contractual in nature, precludes the establishment of any criterion which would be decisive of the determination of the absolute question if a preferred stockholder is entitled to a duly declared stock dividend. This is quite apparent from the case of *Thomas Branch & Co. v. Riverside & Dan River Cotton Mills* to which attention has already been directed to show that the problem is to be solved by a close observance of the terms of the preferred stockholder's contract and at the same time safeguarding his rights which he, as a stockholder, has in the corporation and which are granted to him by statute and the general law governing stock ownership.

Both in principle and as a corollary from his voting right, a preferred stockholder is entitled to a maintenance of his proportionate interest in the corporation. The doctrine that a stockholder is entitled to a continuance of his proportionate interest in the corporation is one of the reasons for the rule that a stockholder, unless restricted by his contract, and regardless of his preferential rights, has the pre-emptive right to subscribe for new shares of the corporation upon the increase of its capital stock. *Crosby v. Stratton,* 17 Colo. App. 212, 68 Pac. 130; *Luther v. C. J. Luther Co.,* 118 Wis. 112, 94 N. W. 69; *Jones v. Concord & M. R. R.,* 67 N. H. 119, 38 Atl. 120; *Gray v. Portland Bank,* 3 Mass. 364, 3 Am. Dec. 156; *Humboldt Driving Park Ass'n v. Stevens,* 34 Neb. 528, 52 N. W. 568; *Meredith v. New Jersey Zinc & Iron Co.,* 55 N. J. Eq. 211, 37 Atl. 539; *Reese v. Montgomery County Bank,* 31 Pa. 78, 72 Am. Dec. 726; *DeKoven v. Alsop,* 205 Ill. 309. A by-law of the Grayslake Gelatin Co.

gives the stockholders, without discrimination, the right to subscribe at no less than par, in proportion to their shareholding, for new shares issued on an increase of the capital stock of the company.

The right of a stockholder to maintain his proportionate interest in the corporation and a control over its affairs by his vote and influence is particularly valuable in a corporation where there are few stockholders and mutual confidence was reposed at the time of organization. *Humboldt Driving Park Ass'n v. Stevens, supra; Way v. American Grease Co.,* 60 N. J. Eq. 263, 47 Atl. 44; *Gray v. Portland Bank, supra; Stokes v. Continental Trust Co.,* 186 N. Y. 285, 78 N. E. 1090; *Page v. American & British Mfg. Co.,* 113 N. Y. S. 734; *Page v. Whittenton Mfg. Co.,* 211 Mass. 424, 97 N. E. 1006.

Unless his right is limited by his contract, a preferred stockholder shares, pro rata, with the common stockholders in the distribution of the assets of a liquidating corporation, after the payment of its debts. *Continental Ins. Co. v. United States,* 259 U. S. 156, 66 L. Ed. 871, 888; *Thomas Branch & Co. v. Riverside & Dan River Cotton Mills, supra; McGregor v. Home Ins. Co. of Newark,* 33 N. J. Eq. 181; *Clarke v. Armstrong,* 151 Ga. 105, 106 S. E. 289. This right of the preferred stockholder is not to be limited or enlarged by implication from his contract unless such implication is to be clearly drawn from the terms of his contract. Thus in *Continental Ins. Co. v. United States, supra,* it is held that stockholders, common and preferred, share alike in the assets of the corporation upon dissolution, if the preference is only as to dividends. We have also come to the conclusion that if a preferred stockholder is given a preference in its assets upon dissolution of the corporation, such preference does not impair his right to an equal distribution of such assets as remain after satisfaction of his preference, unless such preference is expressly, or by

clear implication, exclusive of his right to so share equally in such surplus assets. *Williams v. Renshaw,* 220 N. Y. S. 532.

We pause at this time to point out that the case of *Niles v. Ludlow Valve Mfg. Co.,* as reported in 196 Fed. 994, is not contrary to this view. In that case the question was whether preferred stockholders, ''as to capital as well as dividends'' were entitled to receive a stock dividend declared out of a surplus being the accumulation of annual profits. It was held that the stock dividend was distributable to the common stockholders only, the corporation retaining sufficient property to pay the principal of its capital stock of both classes in full in case of dissolution. The dividend payable to preferred stockholders in the *Niles* case was designated as ''interest or dividends'' and the court inferred from the word ''interest,'' and from a history of the corporation, that the preferred stockholders were making investments of $100 for each preferred share procured by them. Also in the *Niles* case the preferred stockholders, under New Jersey statute, were exempted from personal liability for the debts of the corporation. In *Continental Ins. Co. v. United States, supra,* and *In re Clark's Will,* 226 N. Y. S. 141, it is held that surplus of a corporation representing accumulated earnings and profits become capital assets upon dissolution. The opinion expressed in the conclusion of the *Niles* case that the preferred stockholders in that case had no rights in capital except to the extent of 100 cents on the dollar of their stock, can be warranted only on the ground that the court was of the opinion that the preference given to the preferred stockholders was exclusive and negatived their right to an equal share of capital assets on dissolution.

In the *Niles* case it is stated that underlying the surface of the question of the right of a preferred stockholder to a stock dividend are his rights upon

dissolution of the corporation. To the same effect are the cases of *Thomas Branch & Co. v. Riverside & Dan River Cotton Mills, supra,* and by analogy, *Continental Ins. Co. v. United States, supra.* There should be consistency between the preferred stockholders' rights while the corporation is a going concern and their rights in the dissolution of the corporation.

When it is the intention of persons forming a corporation to restrict the right of a preferred stockholder to share equally in the capital assets on dissolution, it is customary to use appropriate terms to do so. The restriction must be stated in some form before the implication may be drawn that the preference given to preferred stockholders in the capital assets upon dissolution is exclusive of further participation. *Williams v. Renshaw, supra; Murphy v. Richardson Dry Goods Co.,* 326 Mo. 1, 31 S. W. (2d) 72. Different language is used to make clear this restriction, as, "no further dividends or distribution." *Russell v. American Gas and Electric Co.,* 136 N. Y. S. 602; "the common stock is entitled to the total assets." *National Bank of Union Point v. Amoss,* 144 Ga. 425, 87 S. E. 406. The terms "redeemed in full at par" have been held to negative any further participation in capital assets. *Williams v. Renshaw, supra; Murphy v. Richardson Dry Goods Co., supra.*

From the cases heretofore cited we have come to the conclusion that the fact that preferred stockholders are given a preference, upon dissolution, to the repayment of the amount of stock held by them, does not necessarily preclude them from sharing in a surplus existing thereafter. *Re Espuela Land and Cattle Co.* (1909), 2 Ch. 187, 101 L. T. N. S. 13, 78 L. J. Ch. N. S. 729, 16 Manson, 251; *Re Fraser & Chalmers* (1919), 2 Ch. 114, 88 L. J. Ch. N. S. 343, 121 L. T. N. 232, 35 Times L. R. 484, 63 Sol. Jo. 500 (1918–1919), H. B. R. 186; *Callaroy Co., Ltd. v. Giffard* (1928), Ch. 144.

In the *Callaroy* case, *supra,* Astbury, J. quoted the following by Sargent, J., in the *National Telephone* case: "It appears to me that the weight of authority is in favor of the view that, either with regard to dividend or regard to the rights in a winding up, the express gift or attachment of preferential rights to Preference shares, on their creation, is prima facie, a definition of the whole of their rights in that respect, and negatives any further or other right to which, but for the specified rights, they would have been entitled." Judge Astbury continues: "Now in the report I am made to dissent from that. I have now come to the conclusion and I desire to express it plainly that I was wrong in so dissenting. The passage I have just read is right, because it states that 'the express gift or attachment of preferential rights, etc.' is prima facie a definition of the whole of their rights. I may add that in ordinary cases there must be a context. Sargent, J. is dealing with a prima facie effect, but in ordinary cases there is a context. . . . Of course, if the language used is capable of being construed as an exhaustive delimination of the whole right, I agree with Sargent, J." . . . "The construction of this contract is by no means easy but, having given the best attention I can to the authorities, I have come to the conclusion that on its true construction there is one provision and one provision only as to Preference shares. The right conferred upon them is referred to as "the" right, and I cannot find any of the distinguishing features of the *Espuela* case; *In re Fraser and Chalmers;* or the *Anglo-French Music* case, which enabled the courts there to construe the contracts as limited to priority and not as exhaustive deliminations of rights."

Counsel in this case have called our attention to the case of *In re John Dry Steam Tugs, Ltd.* (1932), 1 Ch. 594, and decided February 16, 1932. That case fully sustains the conclusion of this court that a preference

given to stockholders as to dividends and a preference given them on dissolution does not negative their rights to share equally in surplus assets upon dissolution, after the payment of preferred stockholders, unless such preference, as to priority on dissolution, expressly or by clear implication excludes such equal distribution. In the latter case it is said: "The company is in voluntary liquidation, and the question is whether Art. 5 is exhaustive of the rights attached to the preference shares or whether it is expressive only of certain rights they are to enjoy over and above their rights as contributories. . . . The first two paragraphs of the article relate to different stages in the company's history—the one regards it as a going concern, the other as in the course of liquidation. Accordingly the one provides for the share of profits to be assigned to the preference shareholders, during the profit earning period of the company's existence, and the other determines how the capital is to be repaid when the winding-up supervenes. Nothing is said as to the distribution of any assets still remaining for distribution after the capital has been repaid, but in the absence of any provision to the contrary these assets—the joint result produced by the employment of capital contributed by the two classes of shareholders—ought to be shared by all the contributories."

In the *John Dry Steam Tugs* case the articles of association granted the preference shareholders the right to participate in profits over and above their fixed cumulative dividend; and "shall in a winding-up have priority both as to cumulative dividend and return of capital over all other shares." The opinion proceeds: "The same question with which I have to deal has been raised in several cases, and in many of them the provisions relating to the rights of the preference shares have been examined with meticulous

care: *Callaroy Co. v. Giffard* (1926), 1 Ch. 144. Speaking generally, the question has resolved itself into one of construction, namely, whether the memorandum and articles contain an exhaustive delimination of the rights of the preference shareholders. I do not think it would serve any good purpose were I to examine the cases with a view to extracting from them the various indicia which have been taken hold of as establishing the existence of the exhaustive delimination. . . . The features I refer to are: (1) The right of the preference shareholders to participate in profits over and above their fixed cumulative dividend; and (2) the right of priority in the repayment of capital. But there is authority for saying that neither of these features is sufficient to exclude the preference shareholders from participating in the ultimate surplus assets: *Anglo-French Music Co., Ltd. v. Nicoll* (1921), 1 Ch. 386; *In re Espuela Land & Cattle Co.* (1909), 2 Ch. 187; and *In re Fraser & Chalmers, Ltd.* (1919), 2 Ch. 114; and in the absence of any indication in the contract between the ordinary and preference shareholders that the latter were abandoning any of their rights as contributories, I am bound to hold that in this case the surplus assets must be distributed amongst all the shareholders."

The Grayslake Gelatin Company was organized under the laws of Illinois, on March 21, 1922. At the time of its organization, and until April 2, 1929, the corporation had a total authorized and outstanding fully paid capital stock of $160,000 consisting of 2,000 shares of common stock of the par value of $5 per share, and 30,000 shares of preferred stock of the value of $5 per share. The first board of directors consisted of Harry Epstein, Anna Epstein, and the complainant. On March 24, 1922, at its first meeting (all aforesaid directors being present), said board by unanimous vote accepted and adopted a set of by-laws of and for

the corporation. The complainant, as a member of said board, voted in favor of the adoption and acceptance of all of said by-laws and signed the minutes of said meeting at which the said by-laws were adopted and accepted.

Harry Epstein is a stockholder, a director and the president of the corporation. Anna Epstein is a stockholder and director of said corporation. Chester H. Epstein is a stockholder, a director and secretary of the corporation. Between the date of the organization of the corporation and March 23, 1929, the Epsteins were the owners of 28,000 shares of the preferred stock and 1,500 shares of the common stock of the corporation and the complainant was the owner of 2,000 shares of the preferred stock and 500 shares of the common stock of the corporation. Since January 1, 1929, the Epsteins have been the sole directors of the corporation, and there are no other stockholders of the corporation except the Epsteins and complainant.

The articles of incorporation provide: "The preferred stock shall be seven per cent cumulative dividend preferred and shall be a first lien on the assets of the company in the event of its dissolution, over the common stock of said company, and shall be entitled to a payment of a seven per cent cumulative dividend annually before any dividend shall be declared and paid upon the common stock of the company."

The by-laws of the corporation provide: "ARTICLE II, Sec. 1. The capital stock of this corporation shall consist of thirty thousand shares of preferred capital stock, of the par value of five dollars each and two thousand shares of common capital stock, of the par value of five dollars each." "PREFERRED STOCK. Sec. 2. The preferred stock shall be seven per cent cumulative dividend preferred, and shall be a first lien on the assets of the company in the event of its dissolution over the common stock of said company,

and shall be entitled to the payment of a seven per cent cumulative dividend annually before any dividend shall be declared and paid upon the common stock of the company." "INCREASE. Sec. 3. Should the capital stock of the company at any time be increased such increase shall be offered to, and may be subscribed to by the then existing shareholders in proportion to their share holdings at that time at not less than par." "The certificates, both the common and preferred stock of the corporation, provide: 'The holders of the preferred stock shall receive from the surplus or net earnings of the corporation dividends at the rate of seven per cent (7%) per annum on the par value of such stock, and no more, payable quarterly. Such dividends shall be cumulative and as often as any such dividends shall have accrued and remain unpaid, no dividends shall be paid to the holders of the common stock of the corporation. In the event of any liquidation, dissolution or winding up, whether voluntary or involuntary, of the corporation, the holders of the preferred stock shall be paid the par value of their shares and all dividends accrued thereon, before any payment or distribution shall be made to the holders of the common stock.' "

From the date of the organization of the corporation on March 21, 1921, the corporation, by vote of its directors, paid to the holders of the preferred stock cash dividends at the rate of seven per cent per annum, amounting to seven cash dividends, totaling $73,500.

On January 22, 1927, there was placed on the desk of the complainant a letter stating as follows: "This is to inform you that your employment contract with the Grayslake Gelatin Company, dated March 24, 1922, and expiring March 24, 1927, will not be renewed."

On April 2, 1929, at a special meeting of the stockholders of the corporation, a resolution was passed increasing the capital stock from $160,000 (consisting

of 30,000 shares of preferred stock of the par value of $5 each and 2,000 shares of common stock of the par value of $5 each) to $510,000 (consisting of 30,000 shares of preferred stock of the par value of $5, and 72,000 shares of common stock of the value of $5 each). The individual defendants voted 28,500 shares in favor of the resolution and the complainant voted 2,500 shares against it.

On April 23, 1929, a cash dividend of 49 per cent was declared on the common shares, and on April 29, 1929, said cash dividend of 49 per cent was paid to the holders of the common stock, complainant receiving $1,225 and the individual defendants together receiving $3,675. No other cash dividends on common stock were paid.

On May 21, 1929, at a special meeting of the board of directors, a stock dividend in the form of 32,000 shares of common stock of the par value of $5 each, fully paid and nonassessable, was declared to the holders of record of the preferred and common stock and outstanding on March 23, 1929, in proportion to their share holdings at that date, that is to say: One common share for each preferred and common share held of record by said stockholders on said date. The stock dividend was made payable on May 22, 1929. At said special meeting of the board on May 21, 1929, there was transferred from the surplus or net earnings of the corporation $160,000 in full payment of the said 32,000 shares of common stock at the par value. The surplus on that date was approximately $321,408.55.

On May 22, 1929, Chester H. Epstein, as secretary of the corporation, served upon the complainant a written notice informing him of the aforesaid action of the board on May 21, 1929, and delivered to complainant a certificate for 2,500 shares of the common stock of the corporation, fully paid and nonassessable. These shares of common stock are held by the attorney for

the complainant to await the result of this suit. It is not contended that the complainant has in any manner waived his·rights by the acceptance of the said shares of stock.

On May 22, 1929, there were issued and delivered to the Epsteins as stockholders of the corporation, certificates for 29,500 shares of the common stock of the corporation of the par value of $5 each, fully paid and nonassessable.

The surplus of the company, before the increase of its capital stock, belonged to the corporation and it was available for distribution to the common stockholders as cash dividends. By the action of the board of directors of the company, and the processes of the increase of the capital stock of the company and of the stock dividend, the surplus was effectually and irrevocably dedicated to corporate uses and became "capital" of the company and it ceased to be available, under the control of the directors of the company to be distributed as they saw fit. *People of Colorado ex rel. Fraser v. Great Western Sugar Co.*, 29 F. (2d) 810; *Collins v. Portland Electric Power Co.*, 7 F. (2d) 221; *Gibbons v. Mahon*, 136 U. S. 549, 34 L. Ed. 525; *Stamford Trust Co. v. Yale & Towne Mfg. Co.*, 83 Conn. 43, 75 Atl. 90. The distribution of surplus of a corporation rests in the discretion of its directors. *Collins v. Portland Electric Power Co., supra; Robertson v. H. E. Bucklen & Co.*, 107 Ill. App. 369; *Long v. Rike*, 50 F. (2d) 124 (certiorari denied 284 U. S. 657).

The complainant lays great stress on the words of the certificates of stock stating that the preferred stockholders shall receive from the surplus or net earnings of the corporation dividends at the rate of seven per cent per annum on the par value of such stock, "and no more." It is contended by the complainant that the words "no more" bar the preferred stockholders from receiving any stock dividends. In

view of what has already been said herein, we do not think it can be contended that these words limiting the dividends of the preferred stockholders in the going concern, impair their rights to share equally in the assets of the company on dissolution. Nor that such words limit the right of the preferred stockholders to maintain their proportionate interest in the corporation, or the right to subscribe for new shares of stock issued upon increase of capital stock. We find nothing in the other documents limiting such rights of the preferred stockholders to surplus assets on dissolution.

From all of the facts and circumstances presented in this record it shows that the surplus of the company was to a considerable extent the joint result of the money and labor of the respective parties to this litigation. The question presented to us is the legality of the distribution of the stock dividend.

We are of the opinion, and so hold, that the stock dividend was legally distributed to all of the shareholders of stock in proportion to their share holdings. Therefore, for the reasons herein stated, the decree of the circuit court of Lake county is hereby reversed.

*Reversed.*