## UNITED STATES v. GREGG et al.
### No. 600.

District Court, S. D. Texas, Houston Division.
Jan. 10, 1934.

H. M. Holden, U. S. Atty., of Houston, Tex., and Ben S. Fisher and A. V. Dalrymple, Sp. Assts. to Atty. Gen., for the United States.

Sewall Myer, of Houston, Tex., for defendants.

KENNERLY, District Judge.

In this, its bill in equity, filed November 13, 1933, complainant, the United States of America, sues defendants, Paul E. Gregg, M. E. Morrow, Sewall Myer, and the Voice of Labor, Incorporated, of this district and division, alleging that defendants own and are operating a radio broadcasting station at Houston, Tex., known as the "Voice of Labor," and using and operating an apparatus for the transmission of energy, communications, or signals, by radio, without a license from the Federal Radio Commission provided for in the Radio Act of 1927 and amendments (sections 81 to 121, inclusive, title 47 USCA), and seek perpetual injunction enjoining defendants, and each of them, from so doing.

November 24, 1933, defendants filed what they denominate "Defendants' Original Answer." In paragraph I thereof, they "demur generally" to complainant's bill, and say such bill is wholly insufficient in law to require them to answer. In paragraph II thereof, they present special demurrer to complainant's bill, and say it is wholly insufficient, because it does not allege that defendants are broadcasting or threatening to broadcast "upon any channel or frequency designated or set apart by Law or by the Federal Radio Commission for use in interstate or foreign transmission or communication," etc.

In paragraph III thereof, defendants "deny all and singular, each and every allegation" in complainant's bill, and say same is untrue in whole and in part, and demand strict proof thereof, etc. In paragraph IV thereof, defendants make various allegations with respect to matters contained in complainant's bill, and/or in controversy here, to which allegations reference will be made in the discussion.

Complainant (Equity Rule 33 [28 USCA § 723]) moves to strike portions of defendants' answer.

By agreement, all questions respecting the pleadings were submitted along with the case on the merits.

The facts agreed to are contained in a stipulation, as follows:

"It is hereby stipulated between counsel for the United States and counsel for the defendants and each and every one of them that the following facts are agreed upon and admitted in this case:

"1. That the defendants listed in this case are the owners and operators of the radio broadcasting station known as the "The Voice of Labor, Inc.,' and have complete charge of the said station.

"2. That the radio station 'The Voice of Labor, Inc.,' is operating and is located in the Sam Houston Hotel in Houston, Harris County, Texas, and within the jurisdiction of this court.

"3. That the said corporation, 'The Voice of Labor, Inc.,' is a corporation organized under and by virtue of the laws of the State of Texas.

"4. That the defendants and each of them have no radio station license of any kind, nor have had any such license during the times of this complaint, issued in accordance with the Radio Act of 1927 from the said Federal Radio Commission.

"5. That the defendants, and each of them, during the terms of this complaint have had no operator's license to operate a radio station of any kind, issued in accordance with the Radio Act of 1927 from the Federal Radio Commission.

"6. That the said station known as 'The Voice of Labor, Inc.,' operating in the Sam Houston Hotel in Houston, Harris County, Texas, has been operating almost continuously since August 1, 1933, and is operating at this time, and intends to continue operation in the future unless enjoined by this Honorable Court.

"7. That the defendant corporation and the defendants do sell commercial advertising for time over their radio station 'The Voice of Labor, Inc.,' and that they have received reasonable compensation for the same in the past and intend to continue so to do.

"8. That the defendants known as Paul E. Gregg, M. E. Morrow and Sewall Myer are the sole owners of a majority of the stock in said corporation."

This stipulation was at the hearing construed by the parties as follows:

"Mr. Fisher: May it please your honor, at the beginning of this case, may I read the stipulation so that we will understand the issues and have them down as to what is left to be proven. This is a stipulation between counsel for both sides:

" 'It is hereby stipulated between counsel for the United States and counsel for the defendants and each and every one of them that the following facts are agreed upon and admitted in this case:

" '1. That the defendants listed in this case are the owners and operators of the radio broadcasting station known as the "The

Voice of Labor, Inc." and have complete charge of the said station.'

"Mr. Myer: It is understood by counsel that that has reference to control of the station and means the mechanical operation of the station and not the policies.

"Mr. Fisher: You have physical control over the station?

"Mr. Myer: Yes, we have physical control, but we do not want to stipulate ourselves out of court—

"Mr. Fisher: That is correct. The policies have nothing to do with the case. The thing that is being enjoined is the thing that they have control over.

"The Court: You mean physical control?

"Mr. Myer: Physical control; yes.

"Mr. Fisher: '2nd: That the radio station—'(Counsel for the Government continued reading the stipulation filed in court to its conclusion.)

"The Court: If you think the record shows the matter just mentioned you may let it go; if not you may put it in the record, the statement you made just now.

"Mr. Myer: That this stipulation applies only to the physical control and not to the control of any policies in connection with the operation of the station."

The facts found are as follows:

(a) Complainant alleges in its bill that defendants are using and operating an apparatus for the transmission of energy, communications, or signals by radio. I find this to be true. Defendants own, and during daylight hours (usually between 8 a. m. and 5 or 5:30 p. m.) are using and operating a radio broadcasting station, known as the "Voice of Labor," in the Sam Houston Hotel near the center of the business district in the city of Houston, Tex., and have so owned, used, and operated same since August 1, 1933, and intend to continue to do so, and unless restrained will continue so to do. The Voice of Labor Station is not an amateur station within the meaning of such Radio Act.

(b) Under the authority of the Radio Act of 1927, there has been set aside for the use of radio broadcasting stations, generally, that portion of the radio spectrum extending from 550 to 1500 kilocycles. All ordinary radio receiving sets are, generally speaking, constructed in such manner as to receive, and do receive, that portion of the spectrum. Such portion is divided into ninety-six channels, with a separation of 10 kilocycles between each channel. Ninety of

the channels are in use in the United States and six in the Dominion of Canada.

(c) Defendants are, and have been, operating upon a frequency of about 1,310 kilocycles, with station power of from 2 to 4 watts. There are a large number of broadcasting stations in the United States licensed under such Radio Act, and authorized thereunder to broadcast, and which are broadcasting, upon a frequency of approximately or about 1,310 kilocycles, but generally with much higher station watt power. Some, but not all, of such stations being located as follows: Dublin, Tex.; El Paso, Tex. (2); Greenville, Tex.; Lubbock, Tex.; Miami, Fla.; and Shreveport, La.

(d) Complainant alleges that defendants are transmitting energy, communications, and signals by radio from and by means of such station from Houston, Tex., to other states of the United States, its territories and possessions. Except as hereinafter set forth, I find this is not true. Complainant showed an instance or instances of the Voice of Labor having been heard in another state of the United States, but that apparently was soon after defendants began broadcasting, and at a time when they were broadcasting with a greater station-watt power than for some weeks prior to and at the time of this hearing. I do not think that such instance or instances are sufficient to establish that defendants' station can now be heard *under ordinary circumstances* in any other state of the United States, or its territories.

(e) Complainant alleges that defendants are transmitting energy, communications, and signals by radio from and by means of such station, and within the state of Texas; and that the effect thereof extends beyond the borders of Texas to other states and territories of the United States. The evidence does not sustain this allegation, and except as hereinafter set forth, I find it is not, *under ordinary circumstances,* true.

(f) Complainant alleges that defendants are transmitting energy, communications, and signals by radio from and by means of such station within the state of Texas, causing interference with the transmission of communications and signals by radio transmitted by persons duly authorized within Texas to within other states of the United States. The evidence does not sustain this allegation, and except as hereinafter set forth, I find it is not, *under ordinary circumstances,* true.

(g) Complainant alleges that defend-

ants are transmitting energy, communications, and signals by radio from and by means of such station within the state of Texas, causing interference with the transmission of communications and signals transmitted by radio by duly authorized persons from the several states of the United States other than the state of Texas to other states in the United States, its territories and possessions, and causing interference with the reception of such communications and signals by persons within each of such other states, territories, and possessions of the United States. The evidence does not sustain this allegation, and I find it is not, *under ordinary circumstances,* true, except as particularly set forth in subparagraph (j) hereof.

(h) Complainant also alleges that the signals from such station during the month of August, 1933, were transmitted to vessels at sea. The evidence does not sustain this allegation. While it is true that there was evidence that broadcasts from such station were heard on a vessel belonging to the United States government on the Gulf of Mexico out from Galveston, I do not think that such evidence is sufficient to sustain a general charge, if there be such in complainant's bill, that such station was, *under ordinary circumstances,* heard generally on vessels at sea.

(i) The foregoing findings in subparagraphs (d), (e), (f), (g), and (h) are made with the qualification and subject to the following findings:

There are, generally speaking, three types of interference which manifest themselves in the use and operation of radio broadcasting stations and in the reception of radio programs, etc. The first type is called "heterodyne," and manifests itself in the form of a disagreeable whistle or noise of varying pitches which is reproduced by and in the radio receiving set. The second type is called "cross-talk," and manifests itself by the reproduction simultaneously of two or more programs in the radio receiving set, in such manner that neither may be heard satisfactorily by persons listening. The third type, which is known as "blanketing," is an exaggerated form of cross-talk, and to such an extent that the program of one station is completely blotted out by the program of another station in the radio receiving set. Every broadcasting station has what is called a "service area" and a "nuisance area." The "service area" is the area within which the matter or program being broadcast can be well and satisfactorily heard over the ordinary radio receiving set. The "nuisance area" is the area where the broadcast is sufficiently strong to produce heterodyne interference with the broadcasting of other stations, but not sufficient to enable the listener over the ordinary radio set to understand it. The service area of the Voice of Labor, using station power of from 2 to 4 watts, is approximately an average of 30 miles surrounding such station. The nuisance area of the Voice of Labor is not accurately known, but is some considerable distance beyond the service area. The extent of both the service and the nuisance area of the Voice of Labor (and this is true of substantially all broadcasting stations) varies according to, and depends upon, many physical conditions, and upon the character of receiving sets used. *So that there are times when both the service area and the nuisance area of the Voice of Labor may extend to vessels at sea and beyond the borders of the state of Texas, and cause interference such as is discussed in subparagraphs (d), (e), (f), (g), and (h) hereof.*

(j) Complainant alleges that defendants are transmitting energy, communications, and signals by radio from and by means of such station within the state of Texas, and causing interference with the transmission and signals by radio transmitted by stations and persons duly authorized, from other states of the United States, its territories and possessions, into the state of Texas, and with the reception of such communications and signals by persons within the state of Texas. The evidence fully sustains this allegation, and I find that it is true. The evidence is entirely sufficient to show, and I find, that the use and operation of defendants' apparatus at Houston, Tex., by which they transmit energy, communications, and signals by radio within the borders of Texas, interferes with the transmission of energy, communications, and signals by other licensed radio broadcasting stations using or operating upon about or approximately the same frequency (1,310 kilocycles) from places beyond the limits of Texas to places within Texas, and particularly to Houston, Tex., and vicinity. This interference occurs within the service area, the nuisance area, and the blanketing area of the Voice of Labor. The service area and nuisance area of the Voice of Labor are as hereinbefore set forth. The blanketing area of the Voice of Labor is from one to four blocks surrounding such station.

(k) Many of the licensed radio broad-

casting stations in the United States operating upon the frequency of about 1,310 kilocycles, generally speaking, cannot be heard in Houston during daylight hours, and many of them, generally speaking, are heard with much difficulty and very indistinctly. Some of them, however, can be heard in Houston and vicinity during daylight hours. The Voice of Labor, in its daylight broadcasts, seriously interferes with the last two classes.

Other facts will be stated in the discussion.

■ 1. Looking first to the pleadings: Pleas and demurrers in equity cases in federal courts were abolished in 1913, more than twenty years ago (Equity Rule 29 [28 USCA § 723]). The demurrers will be overruled. However, the questions which defendants seek to raise by their demurrers may, and will, be determined in the decision on the merits.

The answer of defendants is not in accordance with Equity Rule 30 (28 USCA § 723), but there is no complaint thereof by complainant. Complainant does move, however (Equity Rule 33 [28 USCA § 723]) to strike portions of the answer, and such motion will be hereinafter considered.

■ 2. Part of the allegations in defendants' answer,[1] which complainant moves to strike

(see first ground of the motion), is to the effect: That defendants have never, in the operation of their broadcasting station, intentionally violated the laws of the United States, etc. That the station is not primarily operated as a commercial venture and for profit, but principally free of charge for educational, religious, charitable, labor, and other such purposes. That the policies of the station, in so far as matters pertaining to labor are involved, are exclusively dictated and controlled by the Houston Labor and Trade Council, the parent body of the labor and trade people of Houston. That the purpose of the station is to furnish a free medium, whereby the laboring people of Houston may be kept in daily touch with all matters of public interest affecting the interests of working people. That each day there is broadcast over the station, addresses and talks by men prominent in labor circles, who advise the laboring people to wholeheartedly support the President of the United States in his effort to restore normalcy, and assuring the laboring people that their rights are being protected by the constituted authorities, and that organized labor will not sanction or tolerate law violations or violence of any kind. That the station is daily used, free of charge, for conducting religious services of any and all denominations—an interdenominational "Go to Church" program being conducted free. That the facilities of the station are offered, free of charge, for any emergency use, and for all civic and charitable uses. That the station is conducting, free of charge, more valuable public service to Houston and vicinity than can

---

[1] This is as follows:

"Defendants say that they have never in the operation of said station intentionally violated any law of the United States and they here now again assert that no law has been violated or will be violated.

"These Defendants specially deny that said station is operated primarily as a commercial venture and for profit. To the contrary Defendants say that said station is operated principally and absolutely free of charge for educational, religious, charitable, labor and other such purposes.

"Defendants say that the policies of said station, insofar as matters pertaining to labor are involved, are exclusively dictated and controlled by the Houston Labor & Trades Council, the parent body of the labor and trades people of Houston, Texas.

"That the purpose of the station is to furnish a medium, free of charge, whereby the laboring people of Houston, Texas, may be kept in daily touch with all matters of public interest affecting the interests of the working people.

"That each day there is broadcast over this station addresses and talks by men prominent in labor circles. That these talks counsel and advise the laboring people to support wholeheartedly the President of the United States in his efforts to restore normalcy. They assure the laboring people that their rights are being protected by the duly constituted authorities and they are told that organized labor will not sanction or tolerate any law violations or violence of any kind.

"The station's facilities are daily used, free of charge, for conducting religious services. Any denomination is welcome, absolutely without cost, to conduct religious services, etc. over said station.

"An interdenominational 'Go to Church' hour is conducted, free of charge, over this station.

"Other stations in Houston do not furnish these services free of charge.

"The facilities of the station are free of charge for any emergency uses and for all civic and charitable uses.

"Defendants say that said station is furnishing a valuable public service to this community, free of charge, which is far more beneficial, convenient and helpful to this community than would be an occasional fragmentary broadcast which might under extraordinary conditions occasionally be heard in this locality from a 'local' licensed station in Shreveport, Louisiana or other out-of-state station broadcasting on the same frequency as is 'The Voice of Labor.'

"That any attempt to entirely discontinue the services being rendered by 'The Voice of Labor' station to the public under the facts and conditions herein alleged would constitute an unreasonable regulation of radio broadcast and a taking of property without due process of law.

"Defendants represent that the hours of broadcast of said station are carefully watched each day and adjustments are made, from time to time, to prevent even the possibility of any law violation.

"That the consultant radio engineers of said station are kept in constant touch with its operation. That these radio engineers are highly skilled and technical men, entirely familiar with the art and science of radio.

"That the technician for said station is a highly trained and thoroughly competent man."

be had over other licensed broadcasting stations broadcasting on a frequency of 1,310 kilocycles. That the hours of broadcast of the station are carefully watched and adjustment made from time to time to prevent the possibility of any law violation, and that those in charge of the station are highly and well trained and thoroughly competent radio men.

I think that complainant's motion to strike such allegations must be sustained, and this is true even though the evidence, heard subject to complainant's motion to strike, sustains such allegation. I find no difficulty in agreeing with defendants that the matter being broadcast is of benefit to the people of Houston and vicinity, nor do I value lightly the beneficent action of defendants in broadcasting such matter free. However, such allegations, and the evidence offered in support thereof, under the law, present no defense to complainant's bill if, as I have concluded and hereinafter discuss, complainant is right in the contention that the Radio Act of 1927 and amendments prohibit defendants from operating their broadcasting station without a license from the licensing power under such act, and such act is valid under the Federal Constitution. The first ground of the motion to strike will be sustained.

■ 3. Are defendants prohibited by such act from operating their broadcasting station without a license under such act, in a manner [see finding (j)] which interferes with the reception in Houston and vicinity of radio energy, communications, programs, etc., from licensed stations beyond the borders of Texas?

The Radio Act of 1927 (sections 81 to 121, title 47 USCA) expressly repealed previous radio acts (sections 51 to 63, and section 51a, title 47 USCA), and must be looked to for the answer. Section 81 of the Code (47 USCA) is as follows (in quoting I have italicized the controlling portions): "Regulation of interstate and foreign radio communications; grant of license. This chapter is intended to regulate all forms of interstate and foreign radio transmissions and communications within the United States, its Territories and possessions; *to maintain the control of the United States over all the channels of interstate and foreign radio transmissions; and to provide for the use of such channels, but not the ownership thereof, by individuals, firms, or corporations,* for limited periods of time, *under licenses granted by Federal authority,* and no such license

shall be construed to create any right, beyond the terms, conditions, and periods of the license. *That no person, firm, company, or corporation shall use or operate any apparatus for the transmission of energy or communications or signals by radio* (a) from one place in any Territory or possession of the United States or in the District of Columbia to another place in the same Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) *within any State* when the effects of such use extend beyond the borders of said State, or *when interference is caused by such use or operation with the transmission of such energy, communications, or signals* from within said State to any place beyond its borders, or *from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State;* or (e) upon any vessel of the United States; or (f) upon any aircraft or other mobile stations within the United States, *except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter."*

Words could hardly be plainer. It is clear that defendants are prohibited by such act from so operating without a license under such act.

4. This conclusion renders it unnecessary to decide whether under finding (i), when read and taken in connection with findings (d), (e), (f), (g), and (h), defendants are in like manner prohibited by such act from operating such station without a license under such act.

■ 5. This brings us to the question raised by defendants, of whether the Radio Act of 1927 and its amendments, and particularly the portion of section 81 thereof above quoted, which prohibits defendants from broadcasting without a license under such act, where they interfere with the receipt in Houston and vicinity of radio communications from licensed stations in other states, is valid under the Federal Constitution (see article 1, § 8, cl. 3). In other words, whether Congress, in licensing and regulating interstate radio broadcasting, may also license and regulate intrastate broadcasting which,

as here, interferes with interstate broadcasting.

In Houston East & West Texas R. Co. v. United States, 234 U. S. 342, 357, 34 S. Ct. 833, 58 L. Ed. 1341, 1351, known generally as the "Shreveport Rate Case," the railroad company sued to enjoin the enforcement of an order by the Interstate Commerce Commission preventing certain carriers from charging greater rates for certain interstate transportation than were concurrently charged for certain intrastate transportation in Texas. The effect of the order was to require an advance in the Texas intrastate rates. The order was sustained under the broad power of Congress to protect and foster interstate commerce. The opinion, after reviewing numerous cases, establishes the proposition that: "Congress is entitled to keep the highways of interstate communication open to interstate traffic upon fair and equal terms."

Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 1515, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18 (commonly called the "Minnesota Rate Cases"), was a suit by certain railroad companies to enjoin the enforcement of certain orders of the Railroad and Warehouse Commission of the State of Minnesota fixing intrastate rates. The court held that the authority of Congress extended to every part of interstate commerce and that in that field its authority was supreme. It said: "This reservation to the States manifestly is only of that authority which is consistent with and not opposed to the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the States, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

To a similar effect are Lancaster v. Mc-

Carty, 267 U. S. 427, 45 S. Ct. 342, 69 L. Ed. 697; Railroad Commission v. C., B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 373, 22 A. L. R. 1086; Florida v. U. S., 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 293.

In Colorado v. U. S., 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 879, the state of Colorado sued to enjoin the enforcement of an order of the Interstate Commerce Commission, authorizing the Colorado & Southern Railway Company to abandon a section of its line in that state. The state contended that the commission had no power to authorize abandonment as to intrastate service and that to this extent the order was void. The Supreme Court held that paramount control over abandonments was vested in the Interstate Commerce Commission, and that an order of this character was designed to remove an obstruction to interstate commerce, etc.

Mondou v. New York, N. H. & H. R. Co., 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 329, 38 L. R. A. (N. S.) 44, involved the validity of a statute defining the liability of carriers engaged in interstate commerce, for injuries sustained by employees while engaged in such commerce. The court announces certain broad basic principles as to the power of Congress to regulate interstate commerce, and defined "regulation" as follows: "'To regulate,' in the sense intended, is to foster, protect, control and restrain, with appropriate regard for the welfare of those who are immediately concerned and of the public at large."

Southern Railway Company v. U. S., 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72, 73, was an action to recover penalties for violation of the safety appliance acts of Congress. In sustaining the validity of these acts, the court said: "And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce."

In Dayton-Goose Creek R. Co. v. United States, 262 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 389, 33 A. L. R. 472, the claim was brought forward that the recapture clause of section 15a of the Interstate Commerce

Act (49 USCA § 15a) "by reducing the net income from intrastate rates invades the reserved power of the States and is in conflict with the Tenth Amendment." The evidence showed that more than half of the company's gross income was derived from the movement of intrastate commerce. The court, through Chief Justice Taft, said: "In solving the problem of maintaining the efficiency of an interstate commerce railway system which serves both the states and the nation, Congress is dealing with a unit in which state and interstate operations are often inextricably commingled. When the adequate maintenance of interstate commerce involves and makes necessary on this account the incidental and partial control of intrastate commerce, the power of Congress to exercise such control has been clearly established."

In Pennsylvania v. West Virginia, 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 1119, 32 A. L. R. 300, Pennsylvania and Ohio sued to enjoin the enforcement of a West Virginia statute, which required natural gas companies located in West Virginia to supply natural gas to meet the needs of its citizens. It was claimed that the enforcement of the statute would greatly curtail the supply of natural gas which had previously been transported by pipe line from West Virginia to Pennsylvania and Ohio and there sold. The Supreme Court held that the act was an unwarranted interference with interstate commerce, and therefore invalid, using this language: "Natural gas is a lawful article of commerce, and its transmission from one state to another for sale and consumption in the latter is interstate commerce. A state law, whether of the state where the gas is produced or that where it is to be sold; which by its necessary operation prevents, obstructs, or burdens such transmission, is a regulation of interstate commerce,—a prohibited interference."

In Pensacola Telegraph Company v. Western Union Telegraph Company, 96 U. S. 1, 24 L. Ed. 708, 709, the state of Florida had granted the Pensacola Telegraph Company the sole and exclusive privilege and right of establishing and maintaining telegraph lines in two counties in that state. A short while prior thereto Congress had passed an act which declared that the construction of telegraph lines should be free to all companies which adopted the act, and contained recitals as to the power of such companies to construct and maintain their lines over and across the public domain, navigable waters, etc. The Western Union Company, under

such act, attempted to construct its line across the two counties embraced in the exclusive grant to the Pensacola Company. The latter sued to restrain such construction. The lower court denied relief and the Supreme Court affirmed the decision. It said:

"Since the case of Gibbons v. Ogden, 9 Wheat. 1 [6 L. Ed. 23], it has never been doubted that commercial intercourse is an element of commerce which comes within the regulating power of Congress. Postoffices and post roads are established to facilitate the transmission of intelligence. Both commerce and the postal service are placed within the power of Congress, because, being national in their operation, they should be under the protecting care of the national government.

"The powers thus granted are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stage-coach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the General Government for the good of the nation, it is not only the right but the duty of Congress to see to it that intercourse among the States and the transmission of intelligence are not obstructed or unnecessarily incumbered by state legislation."

In Brown v. Maryland, 12 Wheat. (25 U. S.) 420, 6 L. Ed. 679, there was an indictment against Brown for violation of a statute of Maryland requiring importers of certain goods to procure licenses before selling them. Brown contended that the act violated those sections of the national Constitution vesting Congress with control of interstate commerce. The court, speaking through Chief Justice Marshall, said:

"There is no difference, in effect, between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold. * * *

"Commerce is intercourse; one of its most ordinary ingredients is traffic. It is

inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

Gloucester Ferry Company v. Commonwealth of Pennsylvania, 114 U. S. 196, 5 S. Ct. 826, 29 L. Ed. 158, 160, was an action brought by Pennsylvania to enforce the collection of tax on the capital stock of the ferry company. The ferry company was engaged in transporting passengers across the Delaware river from New Jersey to Philadelphia, in Pennsylvania. The Supreme Court held that the state was without power to impose the tax, and said: "The means of transportation of persons and freight between the States does not change the character of the business as one of commerce, nor does the time within which the distance between the States may be traversed. Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property and the navigation of public waters for that purpose as well as the purchase, sale and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free, and when subject to duties or other exactions. The power also embraces within its control all the instrumentalities by which that commerce may be carried on and the means by which it may be aided and encouraged. The subjects, therefore, upon which the power may be exerted are of infinite variety. While with reference to some of them which are local and limited in their nature or sphere of operation, the States may prescribe regulations until Congress intervenes and assumes control of them; yet, when they are national in their character and require uniformity of regulation affecting alike all the States, the power of Con-

gress is exclusive. Necessarily that power alone can prescribe regulations which are to govern the whole country."

United Mine Workers of America v. Coronado Coal Company, 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 977, 27 A. L. R. 762, was an action instituted by certain miners of coal against certain labor organizations, claiming that the latter had conspired to control and restrain interstate commerce in violation of the Anti-Trust Act (15 USCA § 1 et seq.), and for recovery of damages. It was alleged that the defendants divided coal mines into two classes, union and nonunion; that the cost of production in the union mines was greatly enhanced so as to impair their ability to complete with the nonunion mines; that defendants had terrorized the employees of the nonunion mines with the intent to drive their production from the channels of interstate commerce. The relief prayed was denied, but the court, during the course of its opinion, said: "It is clear from these cases that if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint. Again, it has the power to punish conspiracies in which such practices are part of the plan to hinder, restrain, or monopolize interstate commerce."

Cases involving navigation seem particularly in point. Outstanding among these is Gibbons v. Ogden, 9 Wheat. (22 U. S.) 1, 6 L. Ed. 23. Ogden (an assignee of Livingston and Fulton) filed a bill for an injunction to restrain Gibbons from navigating, with boats propelled by fire or steam, waters within the state of New York. Ogden alleged that the Legislature of the State of New York had granted to Livingston and Fulton the exclusive right to navigate the waters of that state with boats of this character and that Gibbons was engaged in operating two such boats between New York and Elizabethtown in violation of his (Ogden's) exclusive privilege. Gibbons contended that the state acts were repugnant to the Constitution and laws of the United States; that he had received a license to operate under an act of Congress. The Supreme Court, through Chief Justice Marshall, sustained Gibbons in his position, and said:

"The subject to be regulated is commerce; and our constitution being, as was aptly said at the bar, one of enumeration, and not of definition, to ascertain the extent of the power it becomes necessary to settle the

meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. * * *

"To what commerce does its power extend? The constitution informs us, to commerce 'with foreign nations, and among the several states, and with the Indian tribes.' It has, we believe, been universally admitted that these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend. It has been truly said that commerce, as the word is used in the constitution, is a unit, every part of which is indicated by the term.

"If this be the admitted meaning of the word, in its application to foreign nations, it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it. The subject to which the power is next applied is to commerce 'among the several states.' The word 'among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. * * *

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."

Similar cases are The Daniel Ball v. United States, 10 Wall. (77 U. S.) 557, 19 L. Ed. 1001; Mobile County v. Kimball, 102 U. S. 691, 26 L. Ed. 239; United States v. Rio Grande Dam & I. Co., 174 U. S. 690, 19 S. Ct. 770, 43 L. Ed. 1137; Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956, 959.

See, also, cases involving various phases of radio broadcasting: American Bond & Mortgage Co. v. United States (C. C. A.) 52 F.(2d) 319; Station WBT v. Poulnot (D.

C.) 46 F.(2d) 671; Whitehurst v. Grimes (D. C.) 21 F.(2d) 787; United States v. American Bond & Mtg. Co. (D. C.) 31 F. (2d) 448; General Electric Co. v. Federal Radio Commission, 58 App. D. C. 386, 31 F. (2d) 630, 631; White v. Federal Radio Com. (D. C.) 29 F.(2d) 113.

In the light of these cases and many others that may be cited, I have no difficulty in concluding that the Congress may lawfully, as has been done in this act, require the licensing and regulation of intrastate radio broadcasting stations where, as here, the operation thereof interferes with interstate commerce.

■ 6. But defendants say that such act is unreasonable. It is not. That it is reasonable will be seen by reflecting that a sufficient number of unlicensed and unregulated intrastate radio broadcasting stations, such as is defendants', broadcasting on different frequencies in each community, could and would not only interfere with, but destroy, *all* interstate radio broadcasting.

■ 7. Defendants also insist that they will be unlawfully deprived of vested property rights, etc., if enjoined from broadcasting without a license under such act. Defendants assume that a license will be denied them by the licensing authority under such act. This assumption may or may not be correct. But if it is correct, defendants' position is without merit under the well-settled rules of law. In Federal Radio Commission v. Nelson Bros. Bond & Mtg. Co., 289 U. S. 270, 53 S. Ct. 627, 77 L. Ed. 1167, the question under discussion was as to the right of the Federal Radio Commission to delete an existing station, and it is there said: "That the Congress had the power to give this authority to delete stations, in view of the limited radio facilities available and the confusion that would result from interferences, is not open to question. Those who operated broadcasting stations had no right superior to the exercise of this power of regulation. They necessarily made their investments and their contracts in the light of, and subject to, this paramount authority. This Court has had frequent occasion to observe that the power of Congress in the regulation of interstate commerce is not fettered by the necessity of maintaining existing arrangements which would conflict with the execution of its policy, as such a restriction would place the regulation in the hands of private individuals and withdraw from the control of Congress so much of the field as they might choose by prophetic discernment to bring

within the range of their enterprises. Union Bridge Co. v. United States, 204 U. S. 364, 400, 401, 51 L. Ed. 523, 539, 27 S. Ct. 367; Philadelphia Co. v. Stimson, 223 U. S. 605, 634, 638, 56 L. Ed. 570, 582, 584, 32 S. Ct. 340; Philadelphia, B. & W. R. Co. v. Schubert, 224 U. S. 603, 613, 614, 56 L. Ed. 911, 916, 917, 32 S. Ct. 589; Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 260, 59 L. Ed. 939, 944, 35 S. Ct. [551]; Continental Ins. Co. v. United States, 259 U. S. 156, 171, 66 L. Ed. 871, 884, 42 S. Ct. 540; Sproles v. Binford, 286 U. S. 374, 390, 391, 76 L. Ed. 1167, 1180, 52 S. Ct. 581; Stephenson v. Binford, 287 U. S. 251, 276, 53 S. Ct. 181 [77 L. Ed. 288], 87 A. L. R. [721]; [City of] New York v. Federal Radio Commission [59 App. D. C. 129], 36 F.(2d) 115; [Id.], 281 U. S. 729, 74 L. Ed. 1146, 50 S. Ct. 246; American Bond & Mortg. Co. v. United States (C. C. A. 7th) 52 F.(2d) 318; [Id.], 285 U. S. 538, 76 L. Ed. 931, 52 S. Ct. 311; Trinity Methodist Church, South, v. Federal Radio Commission, 61 App. D. C. 311, 62 F.(2d) 850; [Id.], 288 U. S. 599, 53 S. Ct. 317 [77 L. Ed. 975]."

■ 8. Defendants also say that they have the right to use the frequency of 1,310 kilocycles unless and until the Federal Radio Commission licenses some station in that channel to serve Houston, and that their station does not interfere with the reception of radio communications from present licensed station broadcasting on that frequency, and that unless it is pleaded and proven that the Radio Commission have real need of that frequency, defendants should not be enjoined from using it, etc.[2] These allegations complainant (see second ground of the motion to strike) moves to strike.

Having held that the Radio Act of 1927, under the facts here found, prohibits defend-licensed station broadcasting on a frequency of 1310 kilocycles during the hours of the day when 'The Voice of Labor' broadcasts on such frequency.

"That the licensed stations broadcasting on 1310 frequency are permitted by the Federal Radio Commission to use only limited power, which is not sufficient to produce in Harris County, Texas, which constitutes the limit of 'The Voice of Labor's' service area, an intelligible, satisfactory, connected, or sufficiently audible effect to be heard by the radio audience in this area.

"That during the hours 'The Voice of Labor' station is broadcasting on 1310 frequency, this 1310 channel would be and is silent in this said area and the radio audience in this area will have no entertainment over this 1310 channel if 'The Voice of Labor' is silenced.

"That unless and until it is pleaded and proven that the Federal Radio Commission has a real need or use for this 1310 channel in this local area in Harris County, Texas, any attempt to prevent its use by 'The Voice of Labor' is unreasonable, unconstitutional, arbitrary and void.

"Defendants further say that until and unless it is pleaded and proven that 'The Voice of Labor's' broadcasts materially and substantially interfere with some interstate licensed broadcasting station that any attempt or effort to prohibit 'The Voice of Labor' from broadcasting is unreasonable and unjust and is a violation of the constitutional rights of a citizen and is a useless and needless taking of property without due process of law.

"Your petitioners, while expressly denying that the operation of 'The Voice of Labor' broadcasting station has in any manner violated any provision of the radio law or will in the future violate any provision of said law, represents to the Court as follows:

"Defendants will gladly accept a radio broadcasting license from the Federal Radio Commission licensing it to broadcast on 1310 frequency or any other local, regional or clear channel, using any power sufficient to consistently serve an area of at least fifteen (15) miles from any location in the City of Houston, Texas and will abide by all rules and regulations of the Federal Radio Commission and will do any and all other things required of licensed stations by the Federal Radio Commission.

"Defendants are not law violators and have no intention of violating any law and will gladly submit to licensing and regulation by the Federal Radio Commission and here now and hereby formally apply for a radio license in accordance with the foregoing allegations.

"In event at a future date the Federal Radio Commission licenses some other station at Houston, Texas, to broadcast interstate or foreign radio communications and the broadcast of 'The Voice of Labor' illegally interferes with such licensed station these Defendants will, upon notice of such illegal interference by 'The Voice of Labor' station, immediately discontinue such interference.

"Defendants represent that the Federal Radio Commission has issued licenses to and there are now in actual operation licensed broadcasting stations upon 1310 frequencies with much greater power than has 'The Voice of Labor,' which stations are located much closer to each other than is 'The Voice of Labor' station located to any licensed station on 1310 frequency.

"Defendants have particular reference to a licensed station at Greenville, Texas and a licensed station at Shreveport, Louisiana, each of which stations broadcast on a frequency of 1310 kilocycles. The power of the Greenville station is fifteen (15) watts and the power of the Shreveport station is one hundred (100) watts.

[2] "That until the Federal Radio Commission licenses some station on 1310 kilocycles channel to serve Houston and this local area the attempt by the Federal Radio Commission and the Government to prevent 'The Voice of Labor,' with its weak power, from using this channel to serve only the City of Houston, Texas, constitutes and is an unreasonable attempt at regulation and is an unlawful taking of property without due process of law.

"Defendants represent that any attempt by the Federal Radio Commission to designate and allot all of the channels on the broadcast band of the Radio Spectrum as interstate or foreign channels would be and/or is an unreasonable regulatory action and exceeds the lawful power of the Federal Radio Commission and is not sanctioned by law and is a violation of the rights of the citizen guaranteed to him under the Constitution of the United States and such action is void and unenforcible and would result in the destruction of the lawful business of intra-state radio broadcasting.

"Defendants represent that 'The Voice of Labor' station does not impair, does not destroy and does not interfere with any interstate or foreign radio communication or transmission and that even though 'The Voice of Labor' station was not on the air that the people of Houston and of Harris County, Texas, would not be served with any satisfactory, reasonable or consistent radio entertainment by any

ants from broadcasting without a license under such act, and that such act is valid under the Constitution, it will be readily seen that questions such as these, concerning the use of the frequency upon which defendants are broadcasting (1,310 kilocycles) are for the determination of the licensing authority under such act. Should defendants be dissatisfied with such determination, their right of appeal and review by the courts is preserved with wholesome care under such act (section 96, title 47, USCA). The second ground of complainant's motion to strike is sustained.

9. The remaining question is whether complainant may maintain this suit and is entitled to the relief prayed for. This question must, under well-settled authority, be answered in the affirmative. In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1095; Sanitary Dist. of Chicago v. United States, 266 U. S. 405, 45 S. Ct. 176, 69 L. Ed. 355; United States v. American Bond & Mtg. Co. (D. C.) 31 F.(2d) 449.

It follows that complainant is entitled to a decree, perpetually enjoining defendants, and each of them, from operating, without a license from the licensing power under such 1927 Radio Act, their radio station the "Voice of Labor" in the manner they are found to be operating same in paragraph (j) hereof. The decree to provide that the court retains jurisdiction to enter all necessary orders for the enforcement thereof, and to allow defendants time to make application for license under such act, if they so desire.

Let a decree be drawn and presented accordingly.

"Defendants allege that any attempt by the Federal Radio Commission to designate and claim all channels on the broadcast band of the Radio Spectrum as 'interstate or foreign' is an 'unreasonable' regulation and exercise of power and destruction of the citizen's property, not 'necessary' for any public good.

"Defendants deny that 1310 kilocycles is an interstate channel and that the licensed stations thereon are interstate stations, denies that said channel is being used for interstate purposes and further denies that said channel is needed for interstate or foreign radio communications.

"Defendants allege that said 1310 kilocycle channel is not used and is not needed in the Harris County, Texas area and/or within the consistent service area of 'The Voice of Labor' station for interstate or foreign radio communications.

"That the attempt by the Federal Radio Commission and the Plaintiff herein to prevent Defendants' use of said channel in the service area of 'The Voice of Labor' is an unreasonable, unnecessary and unwarranted attempt to destroy lawful intra-state businesses and intra-state commerce.

"That during the hours when 'The Voice of Labor' station is broadcasting the Federal Radio Commission and the Plaintiff are making no use of said 1310 kilocycle channel within the area served by "The Voice of Labor.'"